**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────────

ANTHONY RUCANO,

                              Plaintiff,

          v.

ANTHONY ANNUCCI, et al.,                    No. 9:18-CV-218
                                            (GTS/CFH)

                         Defendants.

─────────────────────────────────

**APPEARANCES:**

Anthony Rucano
Plaintiff pro se


The Wagoner Firm PLLC                  MATTHEW D. WAGONER, ESQ.
150 State Street, Suite 504
Albany, New York 12207
Attorneys for defendants
D. Venettozzi, A Rodriguez,
Michael Kirkpatrick, D. Uhler,
Lt. Durkin, R. Bishop, P. Devlin,
G.T. King, J. Breyette, C.O. Tucker


Lippes Mathias Wexler Friedman LLP     VINCENT M. MIRANDA, ESQ.
50 Fountain Plaza, Suite 1700          JAMES PETER BLENK, ESQ.
Buffalo, New York 14202
Attorneys for defendant J. Kowalowski


**REPORT-RECOMMENDATION AND ORDER**[1]

─────────────────────

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Plaintiff pro se Anthony Rucano ("plaintiff"), who was, at all relevant times, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants, DOCCS Director of Special Housing/Inmate Disciplinary Program, Donald Venettozzi ("Venettozzi"); DOCCS Acting Director of Special Housing/Inmate Disciplinary Program, Anthony Rodriguez ("Rodriguez"); Superintendent of Clinton Correctional Facility ("Clinton C.F."), Michael Kirkpatrick ("Supt. Kirkpatrick"); Superintendent of Upstate Correctional Facility ("Upstate C.F."), Donald Uhler ("Supt. Uhler"); Clinton C.F. correctional lieutenant ("Lt."), Charles Durkin ("Lt. Durkin"); Clinton C.F. correction captain ("Capt."), Reginald Bishop ("Capt. Bishop"); Clinton C.F. correction captain, Patrick Devlin ("Capt. Devlin"); Clinton C.F. correction sergeant ("Sgt."), Gregory T. King ("Sgt. King"); Clinton C.F. correction officer ("C.O."), Jamie Breyette ("C.O. Breyette"); Clinton C.F. correction officer, Cory Tucker ("C.O. Tucker")—who, at all relevant times were employed by DOCCS—and Clinton C.F. Recreation Program Leader II, J. Kowalowski ("Kowalowski")—a civilian civil service employee—violated his constitutional rights under the First Amendment.  See Dkt. No. 25 ("Amen. Compl.").[2]

---

[2] Following initial review of plaintiff's Amended Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B), Chief U.S. District Court Judge Glenn T. Suddaby, in a Decision and Order dated October 25, 2018, (1) accepted plaintiff's Amended Complaint for filing only to the extent that it asserted (a) First Amendment retaliation and conspiracy claim against Capt. Bishop, Lt. Durkin, Sgt. King, Supt. Kirkpatrick, Rodriguez, and Kowalowski; and (b) First Amendment retaliation, Fourteenth Amendment due process, and conspiracy claims against Capt. Bishop, C.O. Breyette, Capt. Devlin, Supt. Kirkpatrick, Supt. Uhler, C.O. Tucker, Rodriguez, and Venettozzi; and (2) dismissed, without prejudice, the remaining claims asserted in plaintiff's Amended Complaint.  Dkt. No. 35 at 18.  The Court subsequently denied plaintiff's motion for reconsideration of the October 25, 2018 Decision and Order.  See Dkt. Nos. 36, 48.  Further, in a Decision and Order dated September 27, 2019, as relevant here, the Court denied plaintiff's motion for leave to file a second amended complaint, see Dkt. No. 87, and Ordered that plaintiff's Amended Complaint (Dkt. No. 25) remains the operative pleading.  See Dkt. No. 106.

Presently pending before the Court is (1) the motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56 filed by Venettozzi, Rodriguez, Supt. Kirkpatrick, Supt. Uhler, Capt. Bishop, Capt. Devlin, Sgt. King, C.O. Breyette, C.O. Tucker (collectively, where appropriate, "defendants"), see Dkt. No. 178; and (2) the separate motion for summary judgment pursuant to Fed. R. Civ. P. 56 filed by Kowalowski, see Dkt. No. 179. Plaintiff filed a response in opposition to defendants' motion, see Dkt. No. 193, and filed a separate response in opposition to Kowalowski's motion, see Dkt. No. 194. Defendants filed a reply to plaintiff's response opposition of their motion, see Dkt. No. 195, and Kowalowski filed a separate reply to plaintiff's response in opposition to his motion, see Dkt. No. 196. For the reasons that follow, it is recommended that defendants' motion for summary judgment (Dkt. No. 178) be granted in its entirety, Kowalowski's motion for summary judgment (Dkt. No. 179) be granted in its entirety, and plaintiff's Amended Complaint (Dkt. No. 25) be dismissed with prejudice in its entirety.

## I. Background

### A. Plaintiff's Factual Assertions and Claims[3]

### 1. February 2016 Disciplinary Proceeding

The facts are reviewed in the light most favorable to plaintiff as the non-moving party. See subsection II.A., infra.

---

[3] To the extent that plaintiff's exhibits are relevant to the causes of action at issue on the present motion, the Court will consider them as part of the Amended Complaint. See Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) ("A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." (internal quotation marks and citations omitted)).

In November 2015, while incarcerated at Clinton C.F., plaintiff was elected as the new Secretary of the Inmate Liaison Committee ("ILC"). See Amen. Compl. at 12 ¶ 43. In this role, plaintiff "was in charge of maintaining financial records, ILC agendas and other ILC related paperwork." Id. Plaintiff states that, at "the ILC's first meeting with ILC Staff Advisor []Kowalowski in November of 2015, [Kowalowski] issued the ILC members a warning, 'You all have a target on your back, be careful!" Id. at ¶ 44.

Plaintiff alleges that his "first act" as ILC Secretary "was to address problems with the inmate population receiving showers per [DOCCS] Directive # 4009." Amen. Compl. at 13 ¶ 48. Plaintiff drafted a memorandum, dated December 9, 2015 ("the December 9, 2015 memorandum"), in which he addressed the issues concerning Clinton C.F.'s inmate shower policy and his proposed solutions. See id. Plaintiff sent the December 9, 2015 memorandum to, among others, New York State Assemblyman Daniel O'Donnell. See id. at 13-14 at ¶ 48; Dkt. No. 25-1 at 85-88. Following the December 2015 ILC meeting, plaintiff sent a similar, but more detailed, proposal to Clinton C.F. executive staff. See id. at 14 ¶¶ 50, 51.

On December 16, 2015, plaintiff submitted a proposed ILC agenda, which outlined "five assaults on inmates by staff, violations of [DOCCS] Directive # 4803 (inappropriate removal from job), Directive # 2771 ([failure of the Clinton C.F. accountant to reconcile deposits from inmate fundraiser sales]), and the request to review and implement one of the various proposed solutions . . . to address the problems concerning inmate showers." Amen. Compl. at 14 ¶ 54 (internal citations omitted); see id. 10 ¶ 33. Plaintiff alleges that, "[a]t the next weekly ILC meeting[,] Kowalowski told [him]" that "'[i]f [he] submitted this [a]genda [plaintiff] would go to

4

Upstate Box for 270 days[.]" <u>Id.</u> at 15 ¶ 55.  Based on the "angry tone of [Kowalowski's] voice[,]" plaintiff perceived "this as a threat, and was coerced to submit a 'watered down' ILC [a]genda . . . ."  <u>Id.</u>  Plaintiff submits both versions of the proposed December 2015 agenda, the first of which, dated December 16, 2015, is five pages long, and raises the above-mentioned issues.  <u>See</u> Dkt. No. 25-1 at 115-19.  The second version of the agenda, dated December 23, 2015, is a one-page document that omits the complaints of assaults by staff, but includes condensed versions of the remaining issues raised in the originally proposed agenda.  <u>See id.</u> at 121.

At the January 6, 2016 ILC meeting, "Kowalowski violently snatched a piece of paper out of [plaintiff's] hand which listed . . . new proposed TV channels," and stated, "I took it, so what.  You are not as important as you think you are."  Amen. Compl. at 15 ¶ 56.  On January 11, 2016, plaintiff wrote a letter to New York State Assemblyman Daniel J. O'Donnell in which he explained "the ILC Agenda [he] submitted and the abusive treatment [he] was subjected to by []Kowalowski since then[,]" and that he "feared retaliation because Clinton is known throughout the State, weapon thrown in your cell, imaginary assault on staff charges, etc."  <u>Id.</u> at ¶ 57 (citing Dkt. No. 25-1 at 123).  Plaintiff further states that, in his role as Facility Media Review Committee ("FMRC") co-chair, Kowalowski "made numerous disputed rulings on some [of plaintiff's] adult magazines . . ., which [plaintiff] appealed to" to Central Office Media Review Committee ("COMRC").  <u>Id.</u> at 16 ¶ 59.  On January 15, 2016, Director of Education Linda Hollmen ("Hollmen") responded to a series of three letters dated December 16, 17, and 23, 2015, relating to plaintiff's COMRC appeal.  <u>See id.</u> at ¶ 60; Dkt. No. 25-1 at 147.  Hollmen explained that the COMRC determined that the two editions of Cheri

magazine at issue contained models that "may be portrayed as being under age, appealing to a prurient interest and therefore may promote the sexual performance of a minor."  Dkt. No. 25-1 at 147.

In a letter dated January 23, 2016, plaintiff responded to Hollmen's January 15, 2016 letter, and "using the same []DOCCS letterhead [he] had been using for over a year (with law library Supervisor Officer Tedfords knowledge), . . . asked for the ILC Supervisors [sic] name in Albany."  Amen. Compl. at 16 ¶ 60.  On January 29, 2016, plaintiff "sent []Kowalowski a copy [of this letter] via internal mail."  Id.  Plaintiff alleges that, within "a few hours after mailing [a copy of his letter] to []Kowalowski, [Kowalowski] went to the Captains [sic] Office with a copy of the letter that he had just received and, upon information and belief, spoke to Capt. Bishop."  Id. at ¶ 61.  Plaintiff contends that Kowalowski and Capt. Bishop "conspired to cover-up embezzlement of . . . ILC funds and other improprieties revealed in the December [] 2015 Agenda."  Id.  Moreover, plaintiff avers, "[i]n furtherance of this conspiracy, Capt. Bishop directed Sgt. King to write [plaintiff] a false [misbehavior report] for forgery" for using DOCCS letter head on the letter he addressed to the COMRC.  Id.

On January 29, 2016, Sgt. King issued plaintiff a misbehavior report ("the January 29, 2016 misbehavior report"), charging plaintiff with violations of five DOCCS rules, including that plaintiff "forged letterhead depicting a state form from [DOCCS] . . . that he had created . . . on a computer in the law library[,]" which he used in "a letter of personal nature . . . ."  Dkt. No. 25-1 at 155.  Plaintiff avers that "Kowalowski [i]nitiat[ed] [r]etaliation – The January 29[], 2016" misbehavior report.  Amen. Compl. at 16.  Plaintiff

states that he was placed on keeplock status pending his disciplinary hearing.  See id. at 17 ¶ 62.

Plaintiff's Tier III disciplinary hearing relating to the January 29, 2016 misbehavior report began on February 4, 2016 ("the February 2016 disciplinary hearing").  See Amen. Compl. at 17 ¶ 64.  Plaintiff states that the "regularly assigned Tier III Hearing Officer," non-party Lt. Miller, did not preside over his case, but rather, Supt. Kirkpatrick "designated" Lt. Durkin to preside over his Tier III hearing.  Id.  Plaintiff alleges that Lt. Durkin did not normally preside over such hearings and that he "was unfamiliar with the procedures and stopped frequently to read from instructions on how to hold the hearing."  Id.  Plaintiff contends that "[t]hese circumstances let [him] know that [he] was about to be railroaded and revealed an ongoing conspiracy now involving Supt. Kirkpatrick[,] Lt. Durkin . . . , and Capt. Bishop  . . . to insure a finding of guilt regardless of the facts."  Id. (internal quotation marks omitted).  Plaintiff alleges that, "off-the-record and before the hearing, [Lt. Durkin] agree[d] the [January 29, 2016 misbehavior report wa]s problematic."  Id. at 18 ¶ 65.  On February 5, 2016, "[t]he day after the hearing started[,]" plaintiff states that Kowalowski visited his cell "because . . . Lt. Durkin[] told him that [plaintiff] accused him of threatening [plaintiff] with retaliation."  Id. at ¶ 66. Plaintiff avers that, during this meeting, "Kowalowski told [him that] if [he] had come to the ILC meeting at 10 AM on January 29[], 2016, hours before [plaintiff] received the [January 29, 2016 misbehavior report], he would have 'squashed' th[at misbehavior report]."  Id.

Plaintiff alleges that, on the last day of the hearing, his "boss [at the Clinton C.F. law library], [non-party] Officer Tedford, testified that he was aware [that plaintiff] was

7

using [DOCCS] letterhead and had no problem with [him doing] as long as it was being used for communication with []DOCCS employees." Id. at 19 ¶ 70.  At the conclusion of the hearing on February 11, 2016, "despite . . . Tedford['s] testi[mony]" and plaintiff's "non-existent disciplinary history [for his] entire incarceration," he was found guilty and sentence to 90 days in the Clinton C.F. Special Housing Unit ("SHU"). Id. at ¶ 71.  On February 15, 2016, plaintiff administratively appealed Lt. Durkin's disciplinary determination. See id. at 20 ¶ 72; Dkt. No. 25-1 at 168-70.  On March 15, 2016, Rodriguez reduced plaintiff's sanction to 45 days of SHU confinement and loss of packages, commissary, and phone. See id. at 21 ¶ 77; Dkt. No. 25-1 at 176.  Plaintiff submitted a letter requesting reconsideration of his administrative appeal on March 16, 2016. See Dkt. No. 25-1 at 178-79.  On April 6, 2016, Rodriguez reversed Lt. Durkin's February 11, 2016 disciplinary determination. See Amen. Compl. at 21 ¶ 78; Dkt. No. 25-1 at 181.

Liberally construed, the Amended Complaint alleges that, based on the facts relating to the February 2016 disciplinary hearing, Kowalowski, Capt. Bishop, Sgt. King, Supt. Kirkpatrick, Lt. Durkin, and Rodriguez conspired to violate plaintiff's First Amendment rights by filing a false misbehavior report that resulted in SHU confinement in retaliation for plaintiff engaging in protected conduct relating to his service as ILC Secretary. See Amen. Compl. at 12-21, 69.

### 2. March 2016 Disciplinary Proceeding

On February 18, 2016, plaintiff filed an inmate grievance (CL-68902-16), alleging that he had been issued a false misbehavior report (the January 29, 2016 misbehavior

report) in retaliation for his January 23, 2016 letter to Hollmen in which he requested the name of the ILC advisor in the Albany office.  See Amen. Compl. at 20 ¶ 73; Dkt. No. 25-1 at 4-6.  In particular, plaintiff requested that the Inmate Grievance Program ("IGP") "review and investigate the facts and circumstances of [his] grievance in conjunction with [the January 29, 2016] misbehavior report; reverse, dismiss and expunge ticket from [his] record, and restore [him] to [his] law library job and housing area."  Dkt. No. 25-1 at 6.  Plaintiff alleges that non-party IGP Supervisor Gregory filed his grievance incorrectly . . . ."  Id.  The Clinton C.F. Inmate Grievance Resolution Committee ("IGRC") denied plaintiff's grievance, explaining, as relevant here, that "[t]he grievance program can not be used as an additional substitute appeal mechanism.  An individual decision or disposition resulting from a disciplinary proceeding is not grievable."  Id. at 7. Plaintiff appealed the IGRC's response to the Superintendent on March 4, 2016.  See id.  On March 11, 2016, Supt. Kirkpatrick concurred with the IGRC's response.  See id. at 8.  On March 21, 2016, plaintiff appealed Supt. Kirkpatrick's decision.  See id.  On July 6, 2016, the Central Office Review Committee ("CORC") upheld Kirkpatrick's determination.  See id. at 9.

    On February 28, 2016, C.O. Breyette and C.O. Tucker came to plaintiff's cell in Clinton C.F.'s keeplock block to inform plaintiff that he was being transferred to Upstate C.F. and to pack up his belongings.  See Amen. Compl. at 20 ¶ 74, 21 ¶ 79.  Plaintiff "requested to see OMH when [he] was told [he] was being packed up on the draft to [Upstate C.F.]."  Id. at ¶ 74.[4]  Plaintiff states that, while C.O. Breyette and C.O. Tucker packed his belongings outside of his presence when he was in OMH, "an ice pick was

---

[4]  Plaintiff's use of the acronym "OMH" refers to the Office of Mental Health.

allegedly recovered on the inside ledge of [his] cell above the bars." Id. at 21 ¶ 80. Plaintiff alleges that the ice pick was "planted in [his] cell  . . . ." Id. at 20 ¶ 74.  Capt. Bishop signed off on an unusual incident report ("UIR") concerning the weapon.  See id. at 22 ¶ 84; see Dkt. No. 25-2 at 9-11 (Mar. 1, 2016 UIR, listing incident date for the discovery of the ice pick in plaintiff's cell as Feb. 28, 2016).  Plaintiff has included, as an exhibit, the photograph, of the ice pick, which is dated February 29, 2016.  See Dkt. No. 25-2 at 12.  "On the morning of February 29[], 2016, while still in an OMH [o]bservation cell," plaintiff alleges that "Capt[.] Devlin, the security captain in charge of the secure evidence locker and logbooks, banged hard on [plainitff's] cell and said 'What the [f]uck are you still doing here?" to which plaintiff replied, "Why did I get 90 days, the maximum sentence for my first non-violent Tier III [misbehavior report]?"  Id. at ¶ 75.  Plaintiff alleges that, "[a]s [Capt. Devlin] was walking away[,] he said 'You'll see.'"  Id.

On March 1, 2016, plaintiff was transferred from Clinton C.F. to Upstate C.F. and placed in SHU.  See Amen. Compl. at 21 ¶ 80.  On March 2, 2016, plaintiff received an inmate misbehavior report authored by C.O. Breyette, dated February 28, 2016 ("the February 2016 misbehavior report"), which charged him with possession of a weapon in violation of DOCCS Rule 113.10 based on the discovery of the ice pick in plaintiff's keeplock cell at Clinton C.F.  See id. at 20 ¶ 74; Dkt. No. 25-2 at 7.  Over the course of March 4, 22, and 29, 2016, a Tier III disciplinary hearing was held at Upstate C.F. relating to the February 2016 misbehavior report.  See id. at 22 ¶ 82.  Plaintiff alleges that Capt. Bishop "conspired with [Supt.] Ulher of [Upstate C.F.], a former [c]aptain of [s]ecurity at [Clinton C.F.] in 2008[,] to be assigned as the hearing officer at [Upstate C.F.] to hold [the] hearing, even though [Upstate C.F.] employs a full-time . . . Hearing

10

Officer whose only job is to hold hearings." Id. Plaintiff further contends that "[t]his conspiracy involved insuring [sic] that [he] was found guilty of possessing the weapon planted in [his] cell in a continuing course of retaliation for [his] protected free speech conduct as a duly elected ILC representative," including reporting alleged wrongdoing by personnel at Clinton C.F. Id. at ¶ 83.

Plaintiff alleges that, on March 22, 2016, he "requested the E-Block (Unit) log book entries from 9:00 a.m. on February 28, 2016, until 5:00 p.m., on March 1, 2016, multiple times . . . and was told" by Capt. Bishop that he would be given "a copy of the . . . log for the incident entry in the log book" but that the entries for "[t]he 29th . . . and March 1st, [were] irrelevant . . . [.]" Amen. Compl. at 23 ¶ 87 (quoting Dkt. No. 25-2 at 41-42). Plaintiff "objected" to this answer, stating that "there wasn't a weapon found in my cell that day[,]" February 28, 2016. Id. Over plaintiff's objection, Capt. Bishop instructed plaintiff that the log book entries from February 28, 2016, were ". . . all you get. That's all you're getting.'" Id. at 24 ¶ 89 (quoting Dkt. No. 25-2 at 44). Plaintiff also contends that Capt. Bishop told him, "I'm going to get you when the evidence was booked into evidence. That's what you're getting. Not getting the days before or the days after of any of it." Id. at 25 ¶ 95 (quoting Dkt. No. 25-2 at 56). Plaintiff "objected, stating 'I feel this evidence wasn't logged in on February 28, 2016, and without seeing the previous . . . and the forward pages, I won't be able to identify whether or not it was logged in at the time. Specially [sic] since [] the evidence drop box log book [] doesn't have a date [] when the evidence was entered into the drop box . . . .'" id. at 24 ¶ 90 (quoting Dkt. No. 25-2 at 44-45). Plaintiff states that he was "asked if [he] ha[d] the chain of custody from the evidence drop box logbooks," to which he replied, "'No. . . .

11

The log book is missing a date that's supposed to be there for weapons entered into the . . . drop box log book[,]'" and contends that this missing date "explained multiple inconsistencies showing [his] request [wa]s very relevant and material." Id. at ¶ 91 (quoting Dkt. No. 25-2 at 45).

Plaintiff further alleges that C.O. Tucker testified at the hearing by phone, and stated that C.O. Breyette had shown him the weapon recovered from plaintiff's cell on February 29, 2016, "but [that] [Capt. Bishop] refused to allow [plaintiff] to question C.O. Tucker about brining [plaintiff] an I-64 form (recording property packed up) to Mental Health Unit on February 29, 2016." Amen. Compl. at 25 ¶ 94 (citing Dkt. No. 25-2 at 52-54). Plaintiff further states that non-party Sgt. Baker testified by phone that he wrote a memorandum to non-party Lt. Menard "on the day of the incident, identified on the memo as February 29, 2016, not February 28, 2016, the date of the [misbehavior report]." Amen. Compl. at 24 ¶ 92. When plaintiff "questioned" this inconsistency, "Capt. Bishop stated, 'we'll look at that to see if it's a clerical error or not,'" but plaintiff avers that "no effort [wa]s made to question Sgt. Baker while he [wa]s still on the phone." Id. (quoting Dkt. No. 25-2 at 50). However, plaintiff states that he asked Sgt. Baker, "[d]id you drop the . . . weapon in the box the same date that you . . . wrote the memo?" to which Sgt. Baker replied, "'It was on the same day.'" Id. at 24-25 ¶ 93 (quoting Dkt. No. 25-2 at 51). When Sgt. Baker testified again later in the proceeding, Capt. Bishop prevented plaintiff from eliciting an answer from Sgt. Baker as to whether he had ever "'secured evidence in the drop box in previous times[,]'" or if he "'kn[e]w what [he was] supposed to do in the evidence drop box sign in sheet when [he] secure[d] evidence.'" Id. at 26 ¶¶ 99, 100 (quoting Dkt. No. 25-2 73-74). Capt. Bishop

then asked Sgt. Baker if he had "secure[d]" the weapon "on [February 28,] 2016[,] in the evidence drop box[,]" to which Sgt. Baker replied, "Yes I did." Id. at ¶ 101 (quoting Dkt. No. 25-2 at 75).

Plaintiff alleges that Capt. Bishop's evidentiary rulings prevented him "from acquiring documents crucial to [his] retaliation defense," Amen. Compl. at 24 ¶ 91, and that he "was stopped from making a complete record." Id. at 23 ¶ 86 (citing Dkt. No. 25-2 at 42). In addition, plaintiff states that "[Capt.] Devlin . . . failed to move the alleged weapon from . . . the Evidence Drop Box to . . . the Secured Evidence Locker for eight days, when the Directive requires it to be moved within 72 hours." Id. at 27 ¶ 103. Plaintiff posits that "[t]his lends further support to the fact that these log book entries, along with the [misbehavior report], were falsified and fabricated in retaliation against [him]." Id. Based on the foregoing, plaintiff contends that, on "February 29[], 2016, []Capt[.] Devlin conspired with Capt. Bishop to fabricate the [February 28, 2016 misbehavior report], which is supported by the picture of the weapon . . . recorded in the [UIR] as being photographed on February 28[], 2016, but was recorded by [non-party] C.O. Stiles as being photographed on February 29[,] 2016." Id. at 23 ¶ 87 (citing Dkt. No. 25-2 at 12).

On March 29, 2016, plaintiff was found guilty of possession a weapon and sanctioned to 120 days in SHU with 30 days suspended and four months loss of good time credit. See Amen. Compl. at 28; Dkt. No. 25-2 at 110. On April 11, 2016, plaintiff appealed Capt. Bishop's disciplinary determination. See id. at 32 ¶ 132; Dkt. No. 25-2 at 117-23. On June 13, 2016, Venettozzi modified Capt. Bishop's disciplinary determination, reducing plaintiff's sanctions to 90 days in SHU and expunged the four

months of loss of good time credit.  See id. at 34 ¶ 138; Dkt. No. 25-2 at 148.  On

August 15, 2016, plaintiff commenced a proceeding pursuant to N.Y. C.P.L.R. article 78

challenging the March 29, 2016 Tier III hearing determination in New York State court.

See id. at 40-41 ¶¶ 164, 166; Dkt. No. 25-3 at 4-6.  On July 10, 2017, after both parties

had submitted briefs state court, Rodriguez[5] administratively reversed and expunged

Capt. Bishop's March 29, 2016 Tier III hearing determination on the basis that

"circumstances surrounding the incident raise question to inmate's culpability."  Dkt. No.

25-3 at 40; see id. at 41; Amen. Compl. at 42 ¶ 173.

Liberally construed, the Amended Complaint alleges that Capt. Bishop, C.O.

Breyette, C.O. Tucker, Capt. Devlin, Supt. Kirkpatrick, Supt. Uhler, Rodriguez, and

Venettozzi conspired to retaliate against plaintiff in violation of his First Amendment

rights by filing a false misbehavior report and brining a disciplinary proceeding against

him, which resulted in SHU confinement and loss of privileges, for his protected conduct

relating to his service as ILC Secretary.  See Amen. Compl. at 20-42, 70.  Further,

plaintiff alleges that Capt. Bishop violated his Fourteenth Amendment procedural due

process rights by depriving him of an impartial hearing officer, and denying him

documentary and testimonial evidence, which prevented plaintiff from mounting a full

defense.  See id. at 24-27, 70.

## II. Present Motions

---

[5]  Although Venettozzi's name appears on the document reversing and expunging the March 2016
disciplinary determination, see Dkt. No. 25-3 at 40, Rodriguez is the person that actually made the
determination to reverse and expunge plaintiff's disciplinary sentence and Venetozzi's name is contained
on the document based on internal DOCCS policy.  See Dkt. No. 195-17 at 1 (Rodriguez's affidavit in
further support of motion for summary judgment, explaining that, Venetozzi's name appears on the July
10, 2017 decision "because, whenever he's in the office, all correspondence goes out in his name.").

**A. Arguments and Evidence in Support of Defendants' Motion for Summary Judgment (Dkt. No. 178)**

**1. First Amendment Retaliation Claims—Both Disciplinary Hearings**

Defendants aver that plaintiff's First Amendment retaliation claims must fail "because there is no direct evidence of retaliatory motive." Dkt. No. 178-2 at 17. In particular, defendants posit, no causal connection exists between defendants' actions of issuing plaintiff misbehavior reports, conducting disciplinary hearings, or the resulting sanctions and plaintiff's constitutionally protected activities relating to his service on the ILC. See id. Defendants contend that plaintiff's "conclusory allegations to the contrary cannot raise a genuine factual dispute." See id. Rather, defendants argue, the issuance of misbehavior reports and the resulting disciplinary hearings and sanctions were done in furtherance of defendants' job duties and to "ensure that DOCCS policies were followed and [to] ensure the safety of the officers and inmates." Id. at 18. To the extent that DOCCS policies were not followed, defendants state, "these errors were harmless and did not violate the Constitution." Id. at n. 8. Moreover, defendants contend, plaintiff cannot establish that Lt. Durkin, C.O. Tucker, C.O. Breyette, and Supt. Uhler acted with retaliatory animus, because those defendants "did not even know that [plaintiff] was a member of the ILC." Id.; see Dkt. No. 178-7 at 1 ¶ 4 (Sworn affidavit of Lt. Durkin stating, that "I was not aware that [plaintiff] served on the ILC and did not know of any activities he engaged in as a part of that involvement until the hearing on February 4, 2016, . . . . Nor did I ever discuss [plaintiff's] involvement in the ILC with any other [d]efendant."); Dkt. No. 178-10 at 1 ¶ 3 (Sworn affidavit of C.O. Tucker, stating that, "[a]t the time of the events in question, I did not know that [plaintiff] was a member of the [ILC]. Nor did I know [plaintiff] had written letters or agendas with regard to

15

activities on ILC, or engaged in any other constitutionally protected activities."); Dkt. No. 178-5 at 1 ¶ 3 (Sworn affidavit of C.O. Breyett, stating "I did not know that [plaintiff] was a member of Clinton's [ILC], nor did I know about any activities he undertook with respect to the ILC."); Dkt. No. 178-11 at 2 ¶ 4 (Sworn affidavit of Supt. Uhler, stating that, "[a]t the time of the events in question, I was not aware that [plaintiff] had been a member of the [ILC] at Clinton, as I did not work at that facility.  I was not aware that [plaintiff] had engaged in any constitutionally protected behavior.").

Similarly, defendants contend that, although "Capt. Devlin, Sgt. King, and Capt. Bishop" were aware that plaintiff was on the Clinton C.F. ILC, they "did not know that plaintiff authored the Dec. 9 Memo, or the Dec. 16 Agenda."  See Dkt. No. 178-2 at 18; Dkt. No. 178-6 at 2 ¶ 4 (Sworn affidavit of Capt. Devlin, stating "I was aware that [plaintiff] was a member of the [ILC] at Clinton but did not know that he authored a memo on December 9, 2015, regarding the adverse effects of Clinton's shower policy. Nor did I know that on December 16, 2015, he drafted the memo outlining assaults on inmates, inappropriate removal from jobs, and a request to review and implement issues with the showers, or that he ultimately submitted a 'watered down' version of this agenda."); Dkt. No. 178-8 at 1 ¶ 2 (Sworn affidavit of Sgt. King, acknowledging that he knew of plaintiff's involvement on the Clinton ILC, but had no knowledge of the December letter or agenda); Dkt. No. 178-4 at 1, 2 ¶¶ 4, 5 (Sworn affidavit of Capt. Bishop, acknowledging that he knew of plaintiff's involvement on the Clinton ILC, but had no knowledge of the December letter or agenda).

Defendants also contend that "[n]o inference of retaliation arises from the facts in this case."  Dkt. No. 178-2 at 18.  First, defendants aver, no inference of retaliation

16

arises from the administrative reversal of plaintiff's March 2016 disciplinary determination during the pendency of his N.Y. C.P.L.R. article 78 proceeding.  See id. In particular, defendants argue that "[t]he evidence shows that []Venettozzi and []Rodriguez acted because they wanted to do their jobs and ensure that no constitutional violations had occurred[,]" and that plaintiff's "speculative allegations to the contrary cannot raise a genuine issue of fact."  Id.  Defendants assert that plaintiff's filing of a voluminous amount of letters, some of which were only sent to Venettozzi and some of which were only sent to Rodriguez, "overwhelmed their usual review process and caused confusion about the status of his requests."  Id. at 18-19.  Defendants submit the sworn affidavit of Venettozzi, which explains that, "[a]t the time of the events in question, [he] was the Director of Special Housing/Inmate Disciplinary Program employed by [DOCCS,]" and that his "job duties include[d] reviewing and deciding administrative appeals from Tier III disciplinary hearings."  Dkt. No. 178-12 at 1 ¶ 2. Venettozzi states that he "did not work at Clinton [C.F.] and was not personally involved with the issuance of either Inmate Misbehavior Report . . . in this case.  Nor was [he] involved with the hearings, other than to review [plaintiff's] appeals from their decisions." Id. at ¶ 3.  Further, Venettozzi explains that, "[a]side from Acting Director Rodriguez, who works in the same office . . ., [he] never spoke with any of the other defendants about this case during the relevant time period[,]" and that he has "no memory of speaking with . . . Rodriguez about this case during the relevant time period."  Id. at 1-2 ¶ 3.  Venettozzi also denies having knowledge that plaintiff "had engaged in constitutionally protected activity at the time the [misbehavior reports] were issued, or the hearings were held."  Id.  Venettozzi explains that plaintiff "filed numerous letters

and requests with [his] office" and that, "[a]s an administrative matter, it was difficult to keep track of them all, especially since some" letters from Venettozzi's and Rodriguez's office "crossed in the mail with some of [plaintiff's] requests, and [because plaintiff] sent multiple requests regarding the same matters." Id. at 2 ¶ 5. Venettozzi indicates that, "[u]pon information and belief, . . . Rodriguez reviewed some of [plaintiff's] letters, and [he] reviewed others[,]" but that neither of he nor Rodriguez "knew about the correspondence that was reviewed by the other[,]" and denies retaliating against plaintiff or conspiring with any other defendant to do so. Id.; see id. at ¶ 4.

Venettozzi states that, on September 28, 2016, his office sent plaintiff a letter in response to a September 22, 2016 letter that plaintiff submitted requesting reconsideration of the March 2016 disciplinary determination, "informing [plaintiff] that, because the matter was currently the subject of litigation, [Venettozzi's office] would not reconsider the issue at that time." Dkt. No. 178-2 at 5 ¶ 25. However, Venettozzi further explains that, on July 10, 2017, Rodriguez issued the decision that administratively reversed and expunged plaintiff's March 2016 disciplinary determination. See id. at ¶¶ 26-27. Venettozzi states that, "[u]pon information and belief, . . . Rodriguez issued [the] reversal because he was reviewing part of the correspondence from [plaintiff], without realizing that [Venettozzi] had reviewed another part[,]" and that Rodriguez "was not aware that [Venetozzi had issued the September 28, 2016 letter putting [plaintiff's] requests for reconsideration of the [March 2016 disciplinary determination] on hold." Id. at ¶ 27. Venettozzi also states that Rodriguez was not aware that plaintiff had commenced a N.Y. C.P.L.R. article 78 proceeding. See id. However, Venettozzi posits that none of the actions taken by his office were done in

18

retaliation for plaintiff's ILC activities, and, in fact, were all favorable to plaintiff.  See id. at 5-6 ¶ 28.

Defendants also submit Rodriguez's sworn affidavit in support of their motion for summary judgment.  See Dkt. No. 178-9.  Rodriguez, like Venettozzi, states that he has no memory of speaking with Venettozzi about plaintiff's case, did not discuss the case with any other defendants in this action, and denies conspiring or retaliating against plaintiff.  See id. at 2 ¶ 3.  He further explains that he was not even aware that plaintiff engaged in constitutionally protected activity at the time DOCCS personnel issued either misbehavior report.  See id.  Rodriguez reiterates Venettozz's explanation that, given plaintiff's large volume of submissions, it became difficult to keep track of plaintiff's requests, especially given that plaintiff "made multiple requests regarding the same matters."  Id. at ¶ 4.  Like Venettozzi, Rodriguez believes that Venettozzi reviewed some of plaintiff's submissions, while he reviewed others.  See id. at ¶ 6.  Further, Rodriguez explains that, he "was not aware that . . . Venettozzi had issued" his September 28, 2016 letter putting plaintiff's request for reconsideration of the March 2016 disciplinary determination on hold pending the article 78 proceeding.  Id. at 5 ¶ 28. Rather, Rodriguez "believed, based on correspondence from [plaintiff] that [he] had reviewed, [that plaintiff] was merely considering bringing such an action.  Additionally, the case was not in [Rodriguez's] list of urgent cases, as [plaintiff] had already served his sentence."  Id.  Rodriguez explains that, on July 10, 2017, he issued the decision administratively reversing and expunging the March 2016 disciplinary determination, because he "believed, based upon the location of where the weapon was found, that it was possible that someone else had placed the weapon [where it was recovered in

19

plaintiff's cell], not [plaintiff]." Id. at ¶ 29.  However, Rodriguez submits that, "had [he] known that an Article 78 proceeding was pending, [he] would not have issued a decision until the proceeding was complete." Id. at 6 ¶ 30.  Moreover, Rodriguez indicates he did not take any action concerning plaintiff's case in retaliation for plaintiff's ILC activities and, in any event, "all of the actions that [he] and [his] office took were *favorable* to [plaintiff]." Id. at ¶ 31.

Further, defendants argue that, plaintiff's assertion that an inference of retaliation arises from Captain Devlin's alleged comments, "'What the fuck are you still doing here?' and [] 'You'll see,' in response to [plaintiff's] inquiry . . . about his [February 2016 disciplinary determination,]" lacks force.  Dkt. No. 178-2 at 19.  Defendants submit Capt. Devlin's affidavit in which he acknowledges that he saw plaintiff in his cell "at some point," but "vehemently den[ies] that [he] ever said" either of those comments or "ever threaten[ed] him or otherwise imply[ied] that anyone was about to go after him."  Dkt. No. 178-6 at 2 ¶ 8.  "Thus," defendants aver, "the only evidence in this case illustrates that the event never happened."  Dkt. No. 178-2 at 19.  In any event, defendants contend that these "benign and ambiguous" comments fail to establish that Capt. Devlin acted with retaliatory animus because plaintiff does not allege having any prior interactions with Capt. Devlin, and Capt. Devlin was unaware of plaintiff's ILC activities. Id. at 20; see Dkt. No. 178-6 at 2 ¶ 4.

## 2. Section 1983 Conspiracy Claims

### a. February 2016 Disciplinary Proceeding

Defendants aver that, contrary to plaintiff's allegation that Supt. Kirkpatrick, Lt. Durkin, and Capt. Bishop conspired to have Lt. Durkin assigned as the hearing officer at the February 2016 disciplinary proceeding, "the evidence establishes that they never discussed Lt. Durkin's appointment with one another and, thus, could not have conspired." Dkt. No. 178-2 at 21. Rather, defendants aver, Supt. Kirkpatrick independently appointed Lt. Durkin to preside over the hearing without discussing the appointment with either Lt. Durkin or Capt. Bishop. See id. Defendants point to Supt. Kirkpatrick's affidavit in which he indicates that his "decision to assign [Lt.] Durkin as the hearing officer on the first [misbehavior report] was not motivated by a desire to retaliate against [plaintiff] for his participation on the ILC," Dkt. No. 178-13 at 4 ¶ 19, and that his "assign[ment of] Lt.[] Durkin as the hearing officer . . . . was appropriate as he had not taken part in investigating the incidents underlying the [first misbehavior report], and had served as hearing officer on 22 hearings." Id. at 2 ¶ 8.

In his sworn affidavit, Lt. Durkin states that he never discussed plaintiff's involvement on the ILC with any other defendant in this action, and that he "did not request to be appointed [as] the hearing officer" or "discuss being appointed the hearing officer with any other [d]efendant." Dkt. No. 178-7 at 2 ¶¶ 4, 9. Lt. Durkin states that he was not "unfamiliar with the hearing procedures, as [he] had previously served as a hearing officer on 22 occasions[,]" "did not state that the [February 2016 misbehavior report] was 'problematic[,]'" or "inform Kowalowski that [plaintiff] had accused him of retaliation." Id. at 3 ¶¶ 11, 12, 13. Moreover, Lt. Durkin states that his determination that plaintiff was guilty of using "DOCCS letterhead for a purpose that was unrelated to official government business," namely for "try[ing] to obtain adult magazines of a sexual

nature," was based on his understanding of DOCCS regulations, and not to retaliate against plaintiff.  Id. at ¶ 15.  As stated above, Lt. Durkin denies having knowledge that plaintiff served on the Clinton C.F. ILC or of his specific activities as secretary of that body, and never discussed plaintiff's involvement on the ILC with any other defendant. See id. at 2 ¶ 4.

In addition, defendants submit Capt. Bishop's affidavit in which he explains that, "on or around January 26, 2016, [he] believe[s] [he] read a letter that [plaintiff] had written on DOCCS letterhead[,]" which "was not regarding official government business[,]" but instead consisted of "personal correspondence regarding an adult magazine with sexual content that [plaintiff] wished to obtain."  Dkt. No. 178-4 at 2 ¶ 9. Capt. Bishop states that such use of DOCCS letterhead "was . . . inappropriate . . ., and a clear violation of [DOCCS] Directive No. 0008."  Id.  He further notes that, on January 29, 2016, Sgt King issued plaintiff a misbehavior report based on plaintiff's improper use of DOCCS letterhead, but states that he "did not direct Sgt. King to write this [misbehavior report]" and states that he "did not have any personal involvement in the issuance of th[is] misbehavior report or the [February 2016 disciplinary] hearing."  Id. at 2-3 ¶¶ 10, 11.

Finally, defendants contend that Rodriguez was not involved with the first misbehavior report or the February 2016 disciplinary proceeding and, therefore, did not engage in any conspiracy.  See Dkt. No. 178-2 at 21; Dkt. No. 178-9 at 1-2 ¶ 3.  In his sworn affidavit, Rodriguez states, "I did not work at . . . Clinton [C.F.] and was not personally involved with the issuance of either Inmate Misbehavior Report  . . . in this case.  Nor was I involved with the hearings, other than to review [plaintiff's] appeals

from their decisions." Dkt. No. 178-9 at 1-2 ¶ 3. Rodriguez also denies discussing this case with any other defendant aside from Venettozzi, who worked in the same office, and posits that he has "no memory of speaking with . . . Venettozzi about this case during the relevant time period." Id. at 4 ¶ 3.

### b. March 2016 Disciplinary Proceeding

Defendants argue that the evidence establishes that no conspiracy existed with respect to the February 2016 misbehavior report and March 2016 disciplinary proceeding. See Dkt. No. 178-2 at 22. Defendants argue that plaintiff's contention that, because the handwritten date on the last page of the UIR under the photograph of the weapon is February 29, 2016, rather than February 28, 2016, fails to demonstrate that Capt. Bishop and Capt. Devlin engaged in a conspiracy. See id. Defendants posit that the date contained on this document, at most, establishes a harmless ministerial error. See id. Defendants also aver that C.O. Breyette "had no contact with either Capts. Devlin or Bishop." Id. In support of this contention, defendants cite C.O. Breyette's affidavit, which states that he "did not communicate about this incident with any other defendant in this case, other than [C.O.] Tucker, who searched [plaintiff's] cell with him." See id. (citing Dkt. No. 178-5 at 2 ¶ 11). C.O. Tucker also stated in his affidavit that he "had no communications with anyone about the events underlying [C.O. Breyette's misbehavior report], other than [C.O.] Breyette . . . ." Dkt. No. 178-10 at 2 ¶ 10.

Defendants contend that the record evidence establishes that, contrary to plaintiff's allegations, Supt. Kirkpatrick independently assigned Capt. Bishop to preside as the H.O. at the March 2016 disciplinary hearing without ever discussing his decision

with either Capt. Bishop or Supt. Uhler.  See Dkt. No. 178-2 at 22.  Defendants explain

that, because the discovery of the weapon that gave rise to the second misbehavior

report occurred at Clinton C.F., Supt. Kirkpatrick was responsible for assigning the H.O.

to preside over the disciplinary hearing, and neither Capt. Bishop nor Supt. Uhler had

any involvement in that decision.  See id. at 22-23.  In his affidavit, Supt. Uhler explains

that, "[a]t the time of the events in question, [he] was employed . . . as the

Superintendent of Upstate [C.F.]" and that, he neither appointed Capt. Bishop as the

hearing officer for the March 2016 disciplinary proceeding, or discussed his appointment

with anyone, including Supt. Kirkpatrick.  Dkt. No. 178-11 at 1, 2 ¶¶ 2, 6.  "In fact," Supt.

Uhler states, he "did not have any other role in the [March 2016 disciplinary] hearing,

other than the fact that [he] (or [his] designee) conducted a review of the hearing to

ensure that all proper procedures were followed, as is done for all hearings held at

Upstate [C.F.]"  Id.  Supt. Kirkpatrick indicates in his sworn affidavit that "[i]t is common

procedure and courtesy to have a hearing officer from the facility where the incident

occurred [conduct the hearing] if the inmate has been transferred from that facility

before the hearing takes place."  Dkt. No. 178-13 at 3 ¶ 13.  Supt. Kirkpatrick states that

he "did not discuss the appointment with [Capt.] Bishop or [Supt.] Uhler."  Id. at 2 ¶ 11.

Moreover, defendants reassert that Rodriguez and Venettozzi "never discussed this

case with any of the other [d]efendants[]" and, therefore, did not engage in a conspiracy.

Dkt. No. 178-2 at 23.


### 3. Procedural Due Process Claim Against Capt. Bishop Relating to the March 2016 Disciplinary Proceeding

24

Defendants argue that plaintiff had no constitutionally protected liberty interest with respect to his due process claims relating to the March 2016 disciplinary hearing "because his sentence of 120 days in SHU does not constitute an atypical hardship since there were no other adverse conditions of confinement." Dkt. No. 178-2 at 25 (citations omitted). Indeed, defendants contend, plaintiff served only 92 days for both of his SHU sentences. See id. at 26. Defendants also posit that the imposition of loss of packages, commissary, and phone privileges does not constitute adverse conditions such that plaintiff's SHU sanction was atypical. See id.

Further, defendants submit that, contrary to plaintiff's argument, he was afforded all process due. See Dkt. No. 178-2 at 26. In this regard, defendants argue that Capt. Bishop was a fair and impartial hearing officer. See id. at 27. In particular, defendants point to Capt. Bishop's sworn affidavit in which he stated that he was properly appointed to preside over the March 2016 disciplinary hearing because he did not investigate the February 28, 2016 incident, and because his name appears on the UIR only as a matter of form. See id. Capt. Bishop explained that he "did not draft [the] UIR or investigate the claims within it" and that his "name was listed on the UIR as the 'person reporting' because, as a matter of course, the [c]aptain's name was listed on all UIRs." Dkt. No. 178-4 at 3 ¶ 14. Supt. Kirkpatrick corroborated Capt. Bishop's explanation, explaining that Capt. "Bishop did not investigate the incident giving rise to the March 2016 misbehavior report]." Dkt. No. 178-13 at 3 ¶ 16. Supt. Kirkpatrick stated that Capt. Bishop's "name is listed on the UIR simply because the Captain's name is listed on the UIR as a matter of course" and that his "own name is [also] listed on the UIR, not because [he] investigated the incident [or] ha[d] personal knowledge of the events

described in the document, but simply because [he] was the Superintendent of the

facility at the time the UIR was issued, and [his] name [wa]s listed as a matter of

course." Id.  Supt. Kirkpatrick further explained the procedure for how a UIR is filed:

> The UIR initial paperwork is written by the line officer, who
> submits the paperwork to the Sergeant for review.  The
> Sergeant then reviews and submits it to the Watch
> Commander, who reviews and electronically files the UIR
> and submits all paperwork related to the UIR.  The Watch
> Commander then submits it to the Captain, who reviews and
> makes sure the paperwork is complete and in order.  The
> Captain then submits it to the Superintendent.

Id. at ¶ 17.  Supt. Kirkpatrick corroborated Capt. Bishop's statement that he did not

investigate the March 2016 incident by explaining that, "[n]one of these individuals,

aside from the line officer and Sergeant, are considered to have 'investigated' the

incident merely by being part of this chain of review."  Id.  Thus, defendants urge,

plaintiff's due process claim in this regard lacks merit and must be dismissed.  See Dkt.

No. 178-2 at 27.

        Next, defendants contend that plaintiff's due process rights were not violated

when he was not provided all of the drop box logbook dates that he requested.  See

Dkt. No. 178-2 at 27.  Defendants urge that plaintiff was afforded all process to which he

was due because he was provided access to the February 28, 2016 logbook entries and

allowed to question Sgt. Baker, the individual who had photographed the weapon, who

confirmed that the weapon had been recovered and photographed on that date.  See id.

Defendants posit that the additional pages plaintiff requested (i.e. the pages spanning

from February 29, 2016, to March 1, 2016), were not relevant to the March 2016

disciplinary hearing and, therefore, Capt. Bishop did not violate his due process rights

by denying plaintiff access to those log book entries.  See id. at 27-28.

With respect to plaintiff's contention that defendants violated DOCCS evidence rules when the weapon recovered from his cell on February 28, 2016, was not purged from the evidence drop box for approximately eight days instead of within 72 hours, as required pursuant to DOCCS Directive 4910A, defendants posit that such a mistake constitutes, at most, harmless error and did not violate plaintiff's due process rights. See Dkt. No. 178-2 at 28.  Capt. Bishop explained in his sworn affidavit that he determined that, although the failure to purge the evidence drop box within the time required under Directive 4910A constituted "a procedural violation," he "it was harmless because no one accessed the dropbox during those 8 days."  Dkt. No. 178-4 at 5 ¶ 25. Relying on Capt. Devlin's sworn affidavit, defendants posit that, because no one accessed the evidence drop box during the eight days the weapon remained there, that evidence was "unaltered."  Dkt. No. 178-2 at 28; see Dkt. No. 178-6 at 3 ¶ 10 (Capt. Devlin's affidavit stating, although the weapon was not removed from the evidence drop box within 72 hours, as contemplated under DOCCS Directive 4910A, "no one accessed the drop box during this time.").

Moreover, citing Capt. Bishop's affidavit, defendants argue that the incorrect handwritten date of February 29, 2016, contained under the photograph of the weapon, was due solely to a clerical error and is not relevant to the weapons charge that formed the basis of the second misbehavior report.  See Dkt. No. 178-2 at 28; Dkt. No. 178-4 at 4 ¶ 22.  Capt. Bishop explained that, on March 29, 2016, the last day of the March 2016 disciplinary hearing, he questioned Sgt. Baker, who stated that the correct date on which the weapon was recovered and photographed was February 28, 2016, and that the handwritten date contained on the photograph was a "clerical error."  Id. at 5 ¶ 23.

27

Capt. Bishop noted that, between the second and third days of the March 2016 disciplinary hearing, Sgt. Baker reviewed his attendance records, which indicated that he was not working on February 29, 2016, but was working on February 28, 2016, and that he had photographed the weapon; therefore, Capt. Bishop "concluded that the 28th" was the correct date, "and the hand-written date was an error."  See id. at ¶ 24.  In any event, defendants contend, "[t]he date on the photograph did not impact the [h]earing [d]ecision."  Dkt. No. 178-2 at 29.


### 4. Defendants' Remaining Arguments

In addition, defendants contend that the Amended Complaint should be dismissed as to all defendants with respect to plaintiff's First Amendment retaliation and Section 1983 conspiracy claims for lack of personal involvement.  See Dkt. No. 178-2 at 10-16.  In this regard, defendants rely exclusively on their arguments and evidence as to the merits of plaintiff's First Amendment and Section 1983 conspiracy claims.  See id. Similarly, drawing exclusively on their arguments on the merits of plaintiff's First Amendment retaliation and Section 1983 conspiracy claims, defendants aver that they are entitled to qualified immunity.  See id. at 29-32.


### B. Arguments and Evidence in Support of Kowalowski's Motion for Summary Judgment (Dkt. No. 179)

### 1. First Amendment Retaliation

Kowalowski first argues that his statements, which plaintiff alleges constituted "threats," do not constitute adverse action and are not causally related to plaintiff's constitutionally protected activities on the ILC.  See Dkt. No. 179-4 at 7.  First, with

respect to Kowalowski's statement that ILC members "have a target on their backs" and therefore, must "be careful," Kowalowski argues that the context in which he made this statement establishes that it was not meant as a threat, but rather, as advice.  See id. In particular, Kowalowski explains that he made this statement to the entire class of ILC inmates, as he did to every new class of ILC members, and "meant this as a truthful warning to the ILC members."  Dkt. No. 179-3 at 2 ¶ 7.  Kowalowski states, it "was clear from the context of the conversation," that he gave this advice because "inmates tend to see ILC members as the scapegoat for jail conditions that frustrate inmates" and "tensions can arise between security and staff and ILC members."  Id. at 2 ¶¶ 8, 9, 10. Therefore, Kowalowski argues that, understood in the proper context and notwithstanding plaintiff's conclusory assertions to the contrary, this statement cannot constitute adverse action to support plaintiff's First Amendment retaliation claim.  See Dkt. No. 179-4 at 7.  In addition, Kowalowski contends that no causal connection exists between this statement and plaintiff's constitutionally protected ILC activities, as "[t]here is no indication that [p]laintiff had even made a constitutionally-protected statement in the meeting prior to Kowalowski, let alone a statement that actually motivated Kowalowski to express this 'threat.'"  Id. at 8-9.  Indeed, Kowalowski argues, plaintiff did not even perceive this statement as a threat at the time it was made and only later viewed the statement in this light based on "hearing second-hand accounts of the fate of other [ILC] members . . . ."  Id. at 8.

Next, Kowalowski denies threatening plaintiff with SHU confinement in retaliation for the content contained in plaintiff's proposed December 2015 ILC agenda.  See Dkt. No. 179-4 at 9.  Kowalowski points out that, at deposition, plaintiff only recalled that

Kowalowski objected to the length of the proposed agenda.  See id.  (citing Dkt. No. 179-2 at 63 (Deposition Transcript).  Plaintiff testified at deposition that, while he could not recall "exactly why [Kowalowski] said he wasn't going to submit" the proposed December 2015 ILC agenda, Dkt. No. 179-2 at 61, plaintiff watered the agenda down to omit "issues expressed about the assaults by staff."  Id. at 62.  While plaintiff did not recall whether Kowalowski took issue with the inclusion of complaints of assault by staff, plaintiff stated that "there had to be some discussion about that, because it was removed.  And it wouldn't be removed without there being some discussion about it not being appropriate for the agenda."  Id. at 63.  Plaintiff also testified that he "remember[ed] loosely, very vaguely, that there was a conversation that a lot of th[e] stuff [included in the proposed agenda] c[ould] be taken care of off the record."  Id.

Kowalowski also points to plaintiff's January 11, 2016 letter to  New York State Assemblyman O'Donnell, noting that plaintiff stated only that Kowalowski objected to the proposed agenda's length and the highlighting of prison administrator's names.  See id.  In particular, plaintiff's January 11, 2016, letter to Assemblyman O'Donnell, states that Kowalowski informed him that he could not submit his proposed five-page agenda because it was "too long[] and [plaintiff] highlighted their (administration's) names."  Dkt. No. 25-1 at 124.  In his letter to Assemblyman O'Donnell, plaintiff posits that "the real reason why [Kowalowski] was upset" is because the proposed agenda "talk[ed] about misrepresentation and/or misappropriation of $10,000 in ILC fundraiser money, violating [DOCCS] Directive 2771."  Id.   Further, Kowalowski states that, upon observing the length of the proposed agenda, he simply relayed a directive from Supt. Kirkpatrick to plaintiff that the Clinton C.F. administration would no longer accept ILC agendas longer

than one page or containing more than four or five individual items.  See Dkt. No. 179-3 at 4 ¶ 21.  Kowalowski states that he did not comment on or direct plaintiff to "water down" the content of the proposed agenda.  Id. at 4-5 ¶¶ 26-28.  "In fact," Kowalowski states, he "did not review the agenda in any detail before counseling [plaintiff] regarding its length."  Id. at 5 ¶ 28.  At most, Kowalowski states, he believed that submitting an agenda longer than one page would have resulted in Clinton C.F. cancelling the ILC meeting, but not a SHU sanction for any ILC member.  See id. at 5-6 ¶ 27.  Thus, Kowalowski argues, his instruction regarding the length of the proposed agenda did not constitute a threat, and no causal connection exists between the alleged threat and the constitutionally protected contents of the proposed agenda.  See Dkt. No. 179-4 at 10, 11.

Further, Kowalowski contends that plaintiff's allegation that he "snatched" a piece of paper from plaintiff's hand, which contained a list of proposed television channels, and stating, "You are not as important as you think you are" does not constitute a threat sufficient to support a First Amendment retaliation claim.  Dkt. No. 179-4 at 13 (quoting Amen. Compl. at 15 ¶ 56).  In particular, Kowalowski contends that, even assuming that he took the piece of paper and made these comments, his actions do not rise to the level of adverse action.  See id.  Kowalowski avers, plaintiff's allegations amount to, at most, "generalized discourtesy," which is not actionable under Section 1983.  Id.  at 14.

Kowalowski also argues that plaintiff has failed to establish a First Amendment retaliation claim against him based on his alleged involvement with the January 29, 2016 misbehavior report relating to plaintiff's use of DOCCS letter head.  See Dkt. No. 179-4 at 14-17.  Kowalowski explains that he is the co-chair of the FMRC, which is an

entirely separate role from his position as ILC Advisor.  See Dkt. No. 179-3 at 5, 6 ¶¶ 35, 36.  Kowalowski contends that plaintiff received a magazine that was flagged by civilian mail staff and referred to the FMRC, a member of which ultimately determined that the magazine contained prohibited pornographic content.  See Dkt. No. 179-4 at 14.  Kowalowski explains that, although he did not personally review plaintiff's magazine, in his role as co-chair of the FMRC he "sign[s] all determinations made by members of the FMRC."  Dkt. No. 179-3 at 6 ¶ 36; see id. at ¶ 39.  When plaintiff "approached [Kowalowski] about the status of his magazine, [Kowalowski] told him that he was entitled to appeal the FMRC decision to the COMRC in Albany."  Id. at ¶ 42. Plaintiff testified at his deposition that "[t]here was nothing untoward about" the way Kowalowski presented this message to him and that "[t]here was no feelings on [sic] animosity about it[,]" and that plaintiff "didn't take it personally in any way.  [Kowalowski] was doing his job."  Dkt. No. 179-2 at 104.  Plaintiff appealed the FMRC's determination and the COMRC affirmed the FMRC's determination on appeal.  See Dkt. No. 179-3 at 6 at ¶ 41.  Kowalowski notes that, on January 23, 2016, plaintiff sent a memorandum, drafted on official DOCCS interdepartmental communication letterhead, to Hollmen in which he objected to the terminology and reasoning the COMRC used in its decision affirming the FMRC's determination.  See Dkt. No. 25-1 at 149-52.

Kowalski states that, "[i]n January of 2016, [Capt.] Bishop summoned [him] to his office[,]" where they met with non-party Deputy Superintendent Bell ("Deputy Supt. Bell").  Dkt. No. 179-3 at 6 ¶ 43.  Capt. Bishop informed Kowalowski that he and Deputy Supt. Bell "had learned that [plaintiff] had been using certain letterhead in his correspondence."  Id. at ¶ 44.  Capt. Bishop and Deputy Supt. Bell showed Kowalowski

the letterhead, which Kowalowski "recognized . . . from other correspondence that [he] had seen from [plaintiff]." Id. However, Kowalowski "do[es] not know the substance of the correspondence that [Capt.] Bishop showed [him]." Id. at ¶ 45. "Capt. Bishop asked [Kowalowski] if [he] would be willing to write a misbehavior report against [plaintiff] for his use of the letterhead." Id. at 7 ¶ 47. Although Kowalowski "understood [Capt.] Bishop's objection, [he] refused his request." Id. at ¶ 48. Kowalowski explains that, although he "understood the letterhead to be an issue for the security administration[, i]t did not relate to [his] role as Resident Coordinator or ILC Advisor[]" and Kowalowski "had no special knowledge or awareness of the relevant facts" concerning plaintiff's letter. Id. Kowalowski further states that, "[a]t the time of [his] meeting with [Capt.] Bishop and [Deputy Supt.] Bell, [he] was not aware of any connection between the review of [plaintiff's] magazine and the letterhead." Id. at ¶ 50. Moreover, Kowalowski states that, although he "subsequently learned that [Sgt.] King wrote a misbehavior report against [plaintiff] relating to the letterhead[,]" he did not encourage Sgt. King or any other DOCCS personnel to write a misbehavior report, did not participate in any way in the February 2016 Tier III disciplinary hearing, id. at ¶ 53, and was not referenced in the January 2016 misbehavior report. See Dkt. No. 179-4 at 17. Thus, Kowalowski contends, the record evidence does not establish a claim of retaliation against him with respect to the issuance of the January 29, 2016 misbehavior report, because he did not issue the misbehavior report or otherwise have any involvement in the issuance of that misbehavior report, and no causal connection exists between plaintiff's ILC activities and Kowalowski's "tangential involvement" with the FMRC review

of plaintiff's magazine and the January 29, 2016 misbehavior report and subsequent sanction.  See id. at 17-19.

## Section 1983 Conspiracy

Kowalowski first argues that, for the reasons set forth above, plaintiff's Section 1983 conspiracy claim lacks merit.  See Dkt. No. 179-4 at 22.  Alternatively, Kowalowski contends that plaintiff's conspiracy claim should be dismissed because all of the alleged conduct complained of occurred while defendants were acting within the scope of their employment.  See id. at 22-23.

## C. Plaintiff's Responses in Opposition

### 1. Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 193)

Plaintiff first controverts defendants' contention that he failed to establish their personal involvement, arguing that, "when the defendants retaliated against [him] for [his] constitutionally conduct as an ILC member submitting an [a]genda in accordance with DOCCS Directive #4002 . . ., setting forth grievances on behalf of the inmate population, they became personally involved in the constitutional violations against [him]."  Dkt. No. 193-2 at 10-11.  He also posits that "[n]umerous [i]nferences of [r]etaliation are [a]pparent from the [f]acts of [t]his [c]ase."  Id. at 20.  He also avers that Lt. Durkin's "retaliation and conspiracy against [him] was apparent when he violated [his] Due Process rights in the [February 2016 disciplinary] hearing."  Id.  Plaintiff argues that "[t]he fact that Sgt. King conspired and retaliated against [him] is not defeated because Sgt. King did not know about the Dec. 9th letter or the Dec. 16th Agenda, as his

34

lack of knowledge of this memo and agenda did not prevent him from conspiring and retaliating . . . ." Id. (internal citation omitted).

Plaintiff contends that "Kowalowski's statement that he was summoned to Capt. Bishop's office, . . . and was asked by Capt. Bishop if he would be willing to write a misbehavior report . . ., provides a strong causal connection/inference that once Capt. Bishop was unable to have Kowalowski write the [January 2016 misbehavior report, he instead directed Sgt. King to write it." Id. Plaintiff avers that C.O. Breyette's and C.O. Tucker's lack of knowledge of plaintiff's ILC activities "did not prevent them from conspiring with other defendants . . . to retaliate against [him]." Id. at 15. Plaintiff also asserts that contrary to Capt. Devlin's assertion, he did make the statements, "What the fuck are you still doing here" and "You'll see[,]" and that Capt. Devlin was aware of the December 9 letter and December 16 Agenda. Id. at 16. Further, plaintiff avers that the wrong date contained on the photograph of the weapon, along with Capt. Devlin's statements "shows the big picture," and raises an inference that Capt. Devlin retaliated against him. Dkt. No. 193-2 at 21. Moreover, plaintiff avers that Supt. Kirkpatrick "conspired with [Capt.] Bishop and [Supt.] Uhler when he assigned [Capt.] Bishop to be [the] hearing officer . . . ." Id. at 16. Plaintiff urges that this assignment was "irregular" and, along with the fact that he signed the UIR, evidences that Supt. Kirkpatrick conspired with Capt. Bishop and Supt. Uhler to retaliate against him. Id. In addition, plaintiff contends that the "multiple failures of . . . Rodriguez and . . . Venettozzi in the processing, handling and decision making of [his second administrative] appeal is indicative of the IDP Directors [sic] inability to promulgate the Policies, Procedures and Practices properly for all inmates in the . . . custody . . . of []DOCCS." Id. at 20. Plaintiff

35

posits that Venettozzi's and Rodriguez's contentions that plaintiff's submission of an "exorbitant number of letters" confused the review process and that they reviewed his requests without each other's knowledge are "weak excuse[s]." Id.

Plaintiff further argues that he "can provide a factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end result of retaliation against [him] for [his] activities on the ILC." Dkt. No. 193-2 at 22. Plaintiff posits that defendants' affidavits constitute "unsupported allegations that they did not discuss [his] claims," which "lack[] substance and merit." Id. For instance, plaintiff contends, "Capt. Bishop clearly directed Sgt. King to write the first [misbehavior report] after he tried, and failed, to have Kowalowski do so." Id. at 23. He states that Capt. "Bishop's sworn affidavit that he had nothing to do with the [first misbehavior report] is highly doubtful, being that he tried to have Kowalowski do so and failed." Id. "In furtherance of this conspiracy," plaintiff states, Supt. "Kirkpatrick assigned Lt. Durkin . . . to be [his] hearing officer," rather than non-party "Lt. Miller, who was the person regularly assigned to handle such hearings, left for the day." Id. Plaintiff states that defendant have failed to provide him proof that Lt. Miller was "overwhelmed" to justify Lt. Durkin's appointment, therefore strongly implying "that Lt. Durkin was assigned with the specific purpose of finding [him] guilty[.]" Id. at 12. Thus, plaintiff avers, the February 2016 disciplinary hearing was the result of a conspiracy. See id. at 23.

Plaintiff contends that the March 2016 disciplinary hearing was also the result of a conspiracy because "it is disputed that [C.O.] Breyette, as author of the misbehavior report, did not discuss this case with anyone else, with said discussions . . . in tacit

agreement to achieve the unlawful end of retaliation against [him] for [his] protected conduct . . . as a member of the ILC." Dkt. No. 193-2 at 23 (internal citations omitted). Plaintiff contends that Supt. Kirkpatrick's act of assigning Capt. Bishop as the hearing officer at the March 2016 disciplinary hearing is "taken outside the scope of his employment duties," and that Capt. Bishop's and Supt. Uhler's "tacit agreement" to allow Capt. Bishop to preside over the hearing "resulted in their participation in retaliation against [him]." Id. at 24. Plaintiff also opposes Venettozzi's and Rodriguez's assertions that they did not collaborate in reviewing plaintiff's requests, and states that their statements, "together with the facts asserted in [his] Verified Complaint[,] provides admissible proof . . . that they tacitly agreed to conspire and obstruct justice by delaying the timely reversal of [his] administrative appeal during it's [sic] initial review, as opposed to one year later." Id. (internal citations omitted).

In addition, plaintiff opposes defendants' arguments concerning his Fourteenth Amendment due process claims. See Dkt. No. 193-2 at 24. He contends that his SHU constituted "atypical and significant hardship" because he "was left in [his] cell for 4 days without [his] high blood pressure medication and without no [sic] clothing but what [he] was wearing." Id. at 25. Plaintiff contends that Capt. Bishop violated his procedural due process rights by preventing him from eliciting testimony about the chain of custody of the weapon from non-party Sgt. Baker. See id. at 27-28. He also contends that the date contained on the photograph of the weapon was "not a clerical error by Sgt. Baker, but just another fantasy of the defendants that finds absolutely zero support in the record[,] a far cry from harmless error." Id. at 28 (emphasis omitted). Further, plaintiff reasserts that he was denied due process because Capt. Bishop was a partial hearing

officer based on his involvement with the UIR and his alleged involvement in a

conspiracy with Supt. Kirkpatrick and Supt. Uhler.  Id. at 27-29.  Finally, plaintiff

contends that defendants are not entitled to qualified immunity, because "there is no

objectively reasonable view of the facts that show that defendants believed that their

actions were not intentional and did not violate [his] clearly established constitutional

rights."  Id. at 29.


### 2. Plaintiff's Response in Opposition to Kowalowski's Motion for Summary Judgment (Dkt. No. 194)

In opposition to Kowalowski's motion for summary judgment, plaintiff first argues

that "there is overwhelming evidence that Kowalowski engaged in adverse actions

which were . . . causally . . . related to [his] constitutionally protected conduct as a

member of the ILC[.]"  Dkt. No. 194-1 at 11.  Plaintiff premises this argument on the fact

that he has established "that Kowalowski and the defendants he conspired with have

previously engaged in this same retaliatory conduct with ILC members serving before

[him]."  Id.  He further contends that "it is not a coincidence that [Kowalowski] threatened

[him] with 270 days in SHU" because Emerenciano, another inmate at Clinton C.F.,

"received 270 days in SHU for a misbehavior report written by Kowalowski."  Id. at 13.

Plaintiff avers that Kowalowski's statement that ILC inmates have "'a target on [their]

backs,' considered together with [Capt.] Bishop requesting that [Kowalowski] (once

again, like he did to Emerenciano) write the [misbehavior report] against [plaintiff], show

a causal connection between [plaintiff's] protected conduct . . . and the adverse action

[of the] false [misbehavior report] and confinement."  Id. at 14.  Plaintiff avers that "[i]t is

of no moment that Kowalowski chose not to write the [misbehavior report] against

38

[him]," because "it only reveals his attempt to shield himself from being identified as part of the conspiracy against the ILC."  Id.  Moreover, plaintiff argues that, because the revised agenda did not contain "items about assaults by staff, and other serious issues," Kowalowski's statement that he did not read the contents of the proposed agenda is false.  Id. at 15.  In addition, plaintiff contends that Kowalowski's act of "violently snatch[ing]" a piece of paper out of his hand "represented the 'final straw' that compelled [him], through fear, to . . . document this violent act[,]" which he suggests establishes that Kowalowski's threats did, in fact, "dissuade" his First Amendment activities.  Id.  In this regard, plaintiff contends that his letter to Assemblyman O'Donnell provides documentary support for his claims against Kowalowski.  See id. at 16.  As a final matter, plaintiff reiterates his argument that he has "provided a factual basis supporting a meeting of the minds of Kowalowski with [Supt.] Kirkpatrick and [C.O.] Bishop showing that they entered into an agreement, whether expressly or tacitly, to achieve the unlawful end of retaliation against [him] for [his] constitutionally protected conduct as a member of the ILC reporting the atrocities [at Clinton C.F.]."  Id. at 19.

### D. Defendants' Reply to Plaintiff's Opposition (Dkt. No. 195)

Defendants aver that they have met their burden of proving that no genuine issue of fact exists as to plaintiff's claims, in opposition to which, plaintiff has failed to "produce evidence" demonstrating otherwise, as required pursuant to Rule 56.1(b) of the Federal Rules of Civil Procedure.  Dkt. No. 195 at 6.  Further, defendants posit, to the extent that plaintiff has failed to "cite hard evidence" in opposition, "the [C]ourt should deem [his] unsupported 'disputed' facts admitted."  Id.  With respect to plaintiff's

retaliation and conspiracy claims relating to the February 2016 disciplinary hearing, defendants contend that plaintiff offers no evidence to controvert their entitlement to summary judgment, and instead relies solely an unsupported "multi-step inferential chain" to show that defendants conspired to retaliate against him for his activities on the ILC.  Id. at 9.  Further, defendants contend, even assuming arguendo that plaintiff could establish retaliatory motive, he would have received the same punishment because "there is no dispute that . . . plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report."  Id. at 8 (internal quotation marks and citations omitted)).  Defendants contend that plaintiff "admitted on multiple occasions that he used DOCCS letterhead to obtain a magazine that" included prohibited sexual content.  Id.  Defendants also oppose, as belated, plaintiff's argument, contained in his declaration in opposition, that the January 6, 2016 letter did not contain DOCCS letterhead because it did not contain a certain logo.  See Dkt. No. 193 at 3 ¶ 12; Dkt. No. 195 at 9.

### E. Kowalowski's Reply to Plaintiff's Opposition (Dkt. No. 196)

In reply to plaintiff's opposition, Kowalowski asserts that, even if the Court accepts plaintiff's allegations against Kowalowski as true, the alleged "threats" do not constitute adverse action.  See Dkt. No. 196 at 3.  Kowalowski further argues that plaintiff has failed to proffer evidence to establish that he "ever commented on, let alone, veto[ed]," any specific "topic" contained in the December 2016 ILC agenda.  Id. Moreover, Kowalowski contends plaintiff's assertions pertaining to inmate Emerenciano are irrelevant, fail to establish any causal connection between any adverse action and

40

plaintiff's protected activities, and "are of no evidentiary value[.]"  Id. at 6.  In any event, Kowalowski contends that the Emerenciano case is factually distinguishable from the present matter, Emerenciano filed a grievance against Kowalowski before Kowalowski wrote a misbehavior report against that inmate; therefore, unlike plaintiff, Kowalowski avers, "Emerenciano had an actual, individualized conflict with Kowalowski before a misbehavior report [was] issued."  Id. at 6.

Kowalowski also contends that plaintiff's allegation that Kowalowski was involved in the decision to instruct Sgt. King to file the January 2016 misbehavior report relating to plaintiff's use of letterhead based on his attendance at the meeting with Capt. Bishop and Deputy Supt. Bell is "wholly speculative" and "based on no competent evidence." Dkt. No. 196 at 6.  Kowalowski avers that plaintiff's reliance on his January 11, 2016 letter to Assemblyman O'Donnell establishes only plaintiff's "ability to document the minute indignities he perceived and to speculate . . . about malfeasance by DOCCS employees," but not Kowalowski's participation in the January 2016 misbehavior report. Id. at 7.  Furthermore, as with his retaliation claims, Kowalowski argues that the "facts" plaintiff relies on in support of his conspiracy allegations against him are, in fact, plaintiff's "own conclusory statements about what he believes occurred."  Id. at 8.  In the alternative, Kowalowski avers that plaintiff's conspiracy claim against him "must fail under the intracorporate conspiracy doctrine."  Id. at 9.

### III. Discussion[6]
### A. Legal Standard

---

[6]  All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

Summary judgment may be granted only if the submissions of the parties taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists." Price v. Oropallo, No. 9:13-CV-0563 (GTS/TWD), 2014 WL 4146276, at *4 (N.D.N.Y. Aug. 19, 2014) (citing Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006)). Facts are material if they may affect the outcome of the case as determined by substantive law. See Anderson, 477 U.S. at 248. A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (internal quotation marks omitted). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. See Salahuddin, 467 F.3d at 273. The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. See Spiegel v. Schulmann, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in

determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (internal quotation marks and citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999). A plaintiff's verified complaint is to be treated as an affidavit.[7] See Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist     . . . ."). "'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.'" Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (brackets omitted) (quoting Anderson, 477 U.S. at 252).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

---

[7]  Plaintiff's Amended Complaint in this case was not properly verified. See Amen. Compl. at 80.

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, . . . a court is obligated to construe his pleadings liberally.") (internal quotation marks and citations omitted).

## B. First Amendment Retaliation

In order to establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: that "(1) . . . the speech or conduct at issue was protected, (2) . . . the defendant took adverse action against the plaintiff, and (3) . . . there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[I]n the prison context . . . adverse action" is "defined . . . *objectively*[] as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation marks and citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." Id. With respect to the third element of the test, although "'[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' [s]uch circumstantial evidence of retaliation, . . . without more, is insufficient to survive summary judgment." Roseboro v. Gillespie, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (quoting Espinal, 558 F.3d at 129).

"Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." Brooks v. Rock, No. 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *18 (N.D.N.Y. Mar. 28, 2014) (citation omitted); see Scott v. Coughlin, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred." (italics omitted)).

"[P]risoner retaliation claims are easily fabricated, and . . . pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted). Accordingly, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995). Thus, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." Green v. Phillips, No. 04-CV-10202 (TPG), 2006 WL 846272, at *3 (S.D.N.Y. Mar. 31, 2006) (citing Brown v. Middaugh, 41 F. Supp. 2d 172, 191 (N.D.N.Y. 1999)). Consequently, a plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. See Green, 2006 WL 846272, at *3; see also Williams v. Goord, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claim appears insubstantial." (internal quotation marks and citation omitted)). Allegations, although specific, "may still be deemed conclusory if [they are] (1) largely

45

unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." Smith v. Woods, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 (N.D.N.Y. Apr. 24, 2006) (internal quotation marks and citations omitted).

Here, it is undisputed that plaintiff's ILC activities constitute constitutionally protected activity. See Dolan v. Connolly, 794 F.3d 290, 295 (2d Cir. 2015) (holding that "filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body, such as the ILC," constitutes constitutionally protected activity); Dkt. No. 178-2 at 17 (Defendants' memorandum of law in support of motion for summary judgment, acknowledging that plaintiff's "activities on the ILC meet the first prong of the [First Amendment] retaliation test."); Dkt. No. 179-4 at 5 (Kowalowski's memorandum of law in support of motion for summary judgment, acknowledging same). However, as defendants and Kowalowski have established through admissible evidence that no retaliatory motive or causal connection exists between plaintiff's protected activities on the ILC and the alleged adverse action, plaintiff's First Amendment retaliation claims must be dismissed.

### 1. February 2016 Disciplinary Proceeding

### a. Sgt. King

Defendants have established entitlement to summary judgment dismissing plaintiff's First Amendment retaliation claim against Sgt. King based on the allegedly false January 2016 misbehavior report. As an initial matter, "[i]t is well settled that filing

false or unfounded misbehavior charges against an inmate does not give rise to a per se constitutional violation actionable under section 1983." Burroughs v. Petrone, 138 F. Supp. 3d 182, 205 (N.D.N.Y. 2015) (internal quotation marks and citation omitted). Indeed, the Second Circuit has made clear that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report.  There must be more, such as retaliation against the prisoner for exercising a constitutional right." Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997).

It is well settled that "[a]llegations of adverse actions alone . . . are insufficient to establish retaliation absent facts supporting an inference of a causal connection between the adverse actions and the protected conduct." Baskerville v. Blott, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002).  Factors indicating retaliatory motive include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) an inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation.  See id. (citing Colon, 58 F.3d at 872-73).  With regard to temporal proximity, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cty, 252 F.3d 545, 554 (2d Cir. 2001).

However, as the Second Circuit explained:

> [P]risoner retaliation claims are easily fabricated, and    . . .
> pose a substantial risk of unwarranted judicial intrusion into
> matters of general prison administration.  Accordingly, while
> we have held that temporal proximity between protected
> conduct and an adverse action constitutes circumstantial
> evidence of retaliation, we have consistently required some

> further evidence of retaliatory animus before permitting a
> prisoner to proceed to trial on a retaliation claim.

Faulk v. Fisher, 545 F. App'x 56, 58 (2d Cir. 2013) (summary order) (internal citations

and quotation marks omitted).

Here, although the purported adverse action of Sgt. King's issuance of the

allegedly false January 29, 2016 misbehavior report occurred within close temporal

proximity to plaintiff's submissions of the December 9, 2015 memorandum and the

December 16, 2015 proposed ILC agenda, it is well-settled that "temporal proximity

without more is insufficient to survive summary judgment." Flynn v. Ward, No. 15-CV-

1028 (TJM/CFH), 2018 WL 3195095, at *11 (N.D.N.Y. June 7, 2018) (internal quotation

marks and citation omitted). Further, defendants have proffered admissible evidence

establishing that plaintiff's submission of the December 2016 memorandum and

proposed agenda was not "a substantial or motivating factor" in Sgt. King's decision to

issue the January 29, 2016 misbehavior report. Burton, 664 F. Supp. 2d at 367. In his

sworn affidavit, Sgt. King acknowledges that, although he was aware that plaintiff was a

member of the Clinton C.F. ILC, he did not have knowledge of plaintiff's December 9,

2015 memorandum to Assemblyman O'Donnell or the December 16, 2016 proposed

ILC agenda, and that his issuance of the misbehavior report "was not motivated by a

desire to retaliate against [plaintiff] for his activities on [the ILC], or for any other

constitutionally protected activity." See Dkt. No. 178-8 at 1 ¶ 3, 2 ¶ 8; see also Van

Dunk v. Brower, No. 11-CV-4564 (ER), 2013 WL 5970172, at *9 (S.D.N.Y. Nov. 7,

2013) ("To prove a causal connection, the plaintiff must demonstrate that the individuals

who engaged in retaliation had knowledge of the protected conduct."); Henson v.

Gagnon, No. 9:13-CV-0590 (GTS/TWD), 2015 WL 9809874, at *12-13 (N.D.N.Y. Dec.

48

10, 2015) (granting summary judgment and dismissing a pro se inmate's First Amendment retaliation claim against a correction officer for failure to establish causation where the correction officer submitted a sworn statement that he had no knowledge of the plaintiff's grievance against him at the time he conducted a cell search and issued the plaintiff a misbehavior report, and the plaintiff offered no evidence to refute the correction officer's sworn statement), report and recommendation adopted, No. 9:13-CV-0590 (GTS/TWD), 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016).  Further, plaintiff does not aver, and the record does not indicate, that Sgt. King ever had any prior dealings with plaintiff, or made any statements evidencing that Sgt. King had any retaliatory animus against plaintiff.  See Baskerville, 224 F. Supp. 2d at 732.  Moreover, although the February 2016 Tier III disciplinary decision was ultimately reversed on plaintiff's administrative appeal, "no admissible record evidence exists indicating that the reversal was based on a finding that the misbehavior report in question was intentionally false or even unintentionally false."  LeBron v. Selsky, No. 9:05-CV-0172 (GTS/DRH), 2010 WL 1235593, at *5 n.9 (N.D.N.Y. Mar. 31, 2010).

In any event, the admissible evidence establishes that Sgt. King issued the January 2016 misbehavior report because he reasonably believed that plaintiff had abused his position as a law library clerk by using DOCCS letterhead for personal correspondence, in violation DOCCS Directive No. 0008, in order to obtain sexually explicit adult magazines—not for any retaliatory purpose.  See Dkt. No. 178-8 at 2 ¶ 6. Defendants proffer, as an exhibit to Sgt. King's affidavit, a copy of DOCCS Directive No. 0008, which explicitly provides, in relevant part, that "Official Department stationary will only be used for the transaction of official governmental business."  Id. at 6.  Plaintiff's

own documentary evidence—namely, the copy of his January 23, 2016 memorandum to Hollmen—demonstrates that he used DOCCS interdepartmental communication letterhead for his correspondence with the COMRC concerning the FMRC's decision to prohibit plaintiff from obtaining two issues of Cheri magazine. See Dkt. No. 25-1 at 149-52. Indeed, plaintiff does not deny that he used DOCCS letterhead for personal use, and contends only that he did so with the permission of his boss in the law library. See Amen. Compl. at 19 ¶ 70. However, plaintiff relies entirely on his own self-serving statements, and cites no evidence in support of his contention that his boss's alleged permission provided a valid exception to official DOCCS rules concerning the use of department letterhead. Consequently, defendants have established through admissible evidence that Sgt. King would have issued plaintiff the January 2016 misbehavior report regardless of whether he harbored retaliatory animus against plaintiff. See Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18 (citation omitted). Plaintiff's shifting[8] and conclusory assertions to the contrary fail to raise a genuine issue of material fact as to his First Amendment retaliation claim against Sgt. King and are insufficient to overcome defendants' documentary case. Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983) ("[M]ere conclusory allegations or denials are insufficient to withstand a

---

[8]  The undersigned declines to consider plaintiff's contention, for the first time in opposition to defendants' motion for summary judgment, that the stationary he used in correspondence with the FMRC was not official DOCCS letterhead because it did not contain a certain logo. See Dkt. No. 193 at 3 ¶ 12; Lyman v. CSX Transportation, Inc., 364 F. App'x 699, 701 (2d Cir. 2010) (summary order) (affirming the district court's determination that it should not consider claims raised for the first time in opposition to summary judgment); Auguste v. Department of Corrections, 424 F. Supp. 2d 363, 368 (D. Conn. 2006) (holding that a plaintiff "cannot amend his complaint in his memorandum in response to [the] defendants' motion for summary judgment"). Nor is the undersigned inclined to recommend allowing plaintiff to further amend the complaint to add new allegations against the defendants at this late stage in the case. Regardless of whether plaintiff perfectly reproduced official DOCCS letterhead, the admissible evidence makes clear that plaintiff attempted to use official DOCCS letterhead for his personal correspondence—a violation of DOCCS rules. See Dkt. No. 178-8 at 6. Therefore, plaintiff's belated assertions in this regard do not impact the undersigned's analysis as to plaintiff's First Amendment retaliation claim against Sgt. King.

motion for summary judgment once the moving party has set forth a documentary

case") (internal quotation marks and citation omitted), <u>overruled on other grounds</u>,

<u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506 (2002); <u>Zembko v. Northwestern Mut. Life</u>

<u>Ins. Co.</u>, No. 3:05-CV-918 (AHN), 2007 WL 948323, at *4 n.1 (D. Conn. Mar. 26, 2007)

("[A] nonmovant's self-serving conclusory statements that dispute the movant's

evidence cannot create material issues of fact to avoid summary judgment." (internal

quotation marks and citation omitted)).  Based on the foregoing, it is recommended that

plaintiff's First Amendment retaliation claim against Sgt. King be dismissed.


### b. Capt. Bishop

Plaintiff's First Amendment retaliation claim against Capt. Bishop based on the

January 2016 misbehavior report and resulting sanctions is premised exclusively on his

speculative assertion that Capt. Bishop instructed Sgt. King to issue the misbehavior

report after he allegedly consulted with Kowalowski.  <u>See</u> Amen. Compl. at 16 ¶ 61.

Defendants' admissible documentary evidence establishes that Capt. Bishop,

although aware that plaintiff was a member of the ILC, had no knowledge of the

December 9, 2015 memorandum to Assemblyman O'Donnell or the December 16, 2015

proposed ILC agenda; had not read either document; never discussed either document

with Kowalowski; and did not instruct Sgt. King to issue the January 2016 misbehavior

report.  <u>See</u> Dkt. No. 178-4 at 1 ¶ 4, 2-3 ¶¶ 5, 6, 10.  Further, the record is devoid of

facts or evidence indicating that Capt. Bishop made any statements to plaintiff or

anyone else evidencing a retaliatory motive with respect to the January 2016

misbehavior report.  <u>See</u> <u>Baskerville</u>, 224 F. Supp. 2d at 732.  Moreover, plaintiff's

conclusory and speculative assertion that Capt. Bishop directed Sgt. King to issue plaintiff the misbehavior report—a contention that both Capt. Bishop and Sgt. King deny—is insufficient to support a First Amendment retaliation claim against Capt. Bishop with respect to the January 2016 misbehavior report.  See Dkt. No. 178-4 at 2-3 ¶ 10; Dkt. No. 178-8 at 2 ¶ 6 (Sgt. King's affidavit stating, "Capt[.] Bishop did not direct me to write the IMR and . . . .  I did not discuss the 1st IMR with Capt[.] Bishop before I wrote it or thereafter."); see also Henson, 2015 WL 9809874, at *12 ("[C]onclusory statements are not sufficient to support causation on retaliation claims; the claims must be supported by specific facts.").  In addition, Kowalowski's declaration, in which he states that Capt. Bishop asked him to write plaintiff a misbehavior report based on plaintiff's use of DOCCS letterhead does not establish that Capt. Bishop instructed Sgt. King to issue the January 2016 misbehavior report, or that Capt. Bishop had retaliatory motive relating to plaintiff's December 2015 ILC activities.  See Dkt. No. 179-3 at 6-7 ¶¶ 43-48.  Rather, Kowalowski's declaration establishes, at most, that Capt. Bishop objected to plaintiff's use of official DOCCS letterhead, see id. at 7 ¶ 47, which, as explained above, defendants reasonably believed that plaintiff had used in violation of DOCCS rules for personal purposes.  See Dkt. No. 178-8 at 2 ¶ 6.

Plaintiff's contention in opposition that Capt. Bishop "conceded" that he was involved in the issuance of Sgt. King's January 2016 misbehavior report because Capt. Bishop stated in his affidavit that he "d[id] not believe [he] ever discussed [the proposed ILC agenda] with any other defendant in this case" fails to raise a genuine issue of material fact.  Dkt. No. 193-2 at 12.  This cherry-picked statement is taken out of context, and fails to account for Capt. Bishop's and Sgt. King's statements that Capt.

Bishop did not instruct Sgt. King to issue plaintiff the January 2016 misbehavior report. See Dkt. No. 178-4 at 2-3 ¶ 10; Dkt. No. 178-8 at 2 ¶ 6.  Plaintiff does not proffer any other evidence, admissible or otherwise, in opposition.  See Riehl v. Martin, No. 9:13-CV-439 (GLS/TWD), 2014 WL 1289601, at *4 (N.D.N.Y. Mar. 31, 2014) ("The nonmovant must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.").  Accordingly, it is recommended that plaintiff's First Amendment claim against Capt. Bishop based on the January 2016 misbehavior report and February 2016 disciplinary hearing be dismissed.

### c. Lt. Durkin

Defendants submit Lt. Durkin's sworn affidavit in which he states that his determination that plaintiff was guilty of using "DOCCS letterhead for a purpose that was unrelated to official government business" for "try[ing] to obtain adult magazines of a sexual nature" was based on his understanding of DOCCS regulations, and not to retaliate against plaintiff.  Dkt. No. 178-7 at 3 ¶ 15.  Further, Lt. Durkin's sworn affidavit explains that he "did not request to be appointed [as] the hearing officer" at the February 2016 disciplinary hearing or "discuss being appointed the hearing officer with any other [d]efendant."  Id. at 2 ¶¶ 4, 9.  Moreover, Lt. Durkin states that, contrary to plaintiff's contention, he was not "unfamiliar with the hearing procedures, as [he] had previously served as a hearing officer on 22 occasions."  Id. at 3 ¶ 11.  In addition, Lt. Durkin denies stating off the record that "the [February 2016 misbehavior report] was 'problematic[,]'" or "inform[ing] Kowalowski that [plaintiff] had accused him of retaliation." Id. at 3 ¶¶ 12, 13.  Plaintiff's conclusory allegation that Lt. Durkin "railroaded" him by

finding him guilty in retaliation for his December 2015 ILC activities finds no support in the record and fails to establish that Lt. Durkin acted with a retaliatory animus against plaintiff.  Amen. Compl. at 17 ¶ 64.  Plaintiff's conclusory assertions in opposition are insufficient to raise a genuine issue of fact to defeat defendants' documentary case. See Flaherty, 713 F.2d at 13; Zembko, 2007 WL 948323, at *4 n.1.  Therefore, it is recommended that plaintiff's First Amendment retaliation claim against Lt. Durkin be dismissed.

### d. Supt. Kirkpatrick

Defendants submit Supt. Kirkpatrick's sworn affidavit, which explains that, contrary to plaintiff's contention, his decision to assign Lt. Durkin to preside over the February 2016 hearing was not unusual or inappropriate, as Lt. Durkin "had not taken part in investigating the incidents underlying the [January 2016 misbehavior report], . . . he had served as hearing officer on 22 hearings," and was "not motivated by a desire to retaliate against [plaintiff] for his participation on the ILC, or for any other constitutionally protected activity."  Dkt. No. 178-3 at 2 ¶ 8, 4 ¶ 19.  Plaintiff's conclusory allegations to the contrary fails to rebut Supt. Kirkpatrick's sworn affidavit, which is corroborated by Lt. Durkin's sworn affidavit.  See Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998) ("Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact.").  Consequently, it is recommended that plaintiff's First Amendment retaliation claim against Supt. Kirkpatrick based on his decision to assign Lt. Durkin as the hearing officer at the February 2016 disciplinary hearing be dismissed.

### e. Rodriguez

Defendants proffer Rodriguez's sworn affidavit, in which he states that "[n]one of [his] actions were motivated by an intent to retaliate against [plaintiff], nor did [he] retaliated against [plaintiff]. In fact, [he] was not aware that [plaintiff] had engaged in a constitutionally protected activity at the time the" misbehavior reports were issued, or the hearings were held. Dkt. No. 178-9 at 2 ¶ 3. Thus, as defendants have submitted admissible documentary evidence that Rodriguez did not have knowledge of plaintiff's constitutionally protected activity at the time he made his determinations with respect to plaintiff's administrative appeal, defendants have demonstrated that no causal connection exists between the protected conduct and Rodriguez's actions. See Henson, 2015 WL 9809874, at *12-13; Van Dunk, 2013 WL 5970172, at *9. Moreover, the record is devoid of evidence, such as prior interactions or statements made by Rodriguez to plaintiff or other defendants to Rodriguez indicating that Rodriguez harbored any retaliatory animus against plaintiff. See Baskerville, 224 F. Supp. 2d at 732. As defendants contend, plaintiff's conclusory and speculative assertions to the contrary do not raise a genuine issue of material fact sufficient to defeat defendants' documentary case. See Dkt. No.178-2 at 17; Flaherty, 713 F.2d at 13; Zembko, 2007 WL 948323, at *4 n.1. Consequently, it is recommended that plaintiff's First Amendment retaliation claim against Rodriguez based on the February 2016 disciplinary hearing and subsequent administrative appeal, be dismissed.

## 2. March 2016 Disciplinary Proceeding

### a. C.O. Breyette and C.O. Tucker

The sworn affidavits of C.O. Breyette and C.O. Tucker constitute admissible documentary evidence that establishes that those defendants had no knowledge of plaintiff's involvement with the Clinton C.F. ILC or that he had engaged in constitutionally protected activity in his role as ILC secretary.  See Dkt. No. 178-5 at 1 ¶ 3; Dkt. No. 178-10 at 1 ¶ 3.  Therefore, defendants have established that neither C.O. Breyette nor C.O. Tucker had the requisite knowledge of plaintiff's constitutionally protected activities to sustain a First Amendment retaliation claim against them.  See Henson, 2015 WL 9809874, at *12-13; Van Dunk, 2013 WL 5970172, at *9.  Further, plaintiff does not allege that he had any prior interaction with C.O. Breyette or C.O. Tucker, or that either of those defendants made any statements or took any previous actions evidencing a retaliatory motive.  See Baskerville, 224 F. Supp. 2d at 732.  In addition, more than two months passed between plaintiff's constitutionally protected December 2015 ILC activities, C.O. Breyette's and C.O. Tucker's February 28, 2016 search of plaintiff's cell and resulting misbehavior report; thus, "[p]laintiff has not made a strong showing temporal proximity in support of his retaliation claim" against these defendants.  Pierrot v. Hahn, No. 9:15-CV-1415 (DNH/CFH), 2017 WL 4221117, at *8 (N.D.N.Y. July 28, 2017), report and recommendation adopted, No. 9:15-CV-1415 (DNH/CFH), 2017 WL 4221072 (N.D.N.Y. Sept. 21, 2017); see Webster v. Fischer, 694 F. Supp. 2d 163, 183-84 (N.D.N.Y.) (holding that it was "questionable whether the disciplinary action followed [the] plaintiff's complaints close enough in time to raise an inference of retaliation" where "at least two months passed between plaintiff's complaints and the April 14, 2006 misbehavior reports and the resulting determination

that [the] plaintiff was guilty of the charges, which was issued at the conclusion of disciplinary hearing on April 19, 2009"), aff'd, 398 F. App'x 683 (2d Cir. 2010).

Moreover, although Rodriguez reversed plaintiff's guilty determination on administrative appeal because he "believed, based upon the location of where the weapon was found, that it was possible that someone else had placed the weapon there, not [plaintiff]," Dkt. No. 178-9 at ¶ 29—"no admissible record evidence exists indicating that the reversal was based on a finding that the misbehavior report in question was intentionally false or even unintentionally false." LeBron, 2010 WL 1235593, at *5 n.9. Indeed, defendants have established that C.O. Breyette would have issued plaintiff the misbehavior report regardless of improper retaliatory motive. See Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18 (citation omitted). C.O. Breyette and C.O. Tucker explain that they conducted a search of plaintiff's cell together on February 28, 2016 because plaintiff "was scheduled to be transferred to a different facility" and "[i]t is protocol to search [an] inmate's room when it is being packed." Dkt. No. 178-5 at 2 ¶¶ 5, 6; Dkt. No. 178-10 at 2 ¶¶ 4, 5. C.O. Breyette and C.O. Tucker both state that, during the cell search, they discovered "weapon on the ledge above the metal bars of the cell. It was a long, thin piece of metal, 7 inches long and 1/8 inches wide with a sharp point on one end and a handle on the other[, which] looked a bit like an ice pick." Dkt. No. 178-5 at 2 ¶ 8; Dkt. No. 178-10 at 2 ¶ 7. C.O. Breyette explains that he issued plaintiff the February 2016 misbehavior report because an inmate "possessing a weapon is a serious violation of the DOCCS policy that endangers officers and other inmates[,]" and both he and C.O. Tucker explain that they "were not motivated by a desire to retaliate against him for his activities on [the ILC], or for any

other constitutionally protected activity[,]" but rather "to maintain a safe and secure environment at Clinton for both officers and inmates."  Dkt. No. 178-5 at ¶ 13; Dkt. No. 178-10 at 2 ¶ 11.  Thus, "[t]he record ... establishes that the misbehavior report was issued not with retaliatory intent, but simply because contraband . . . was in fact recovered from [p]laintiff's cell during that search." LeBron, 2010 WL 1235593, at *5. Aside from plaintiff's conclusory allegation in his unverified Amended Complaint that an unidentified person "planted" the ice pick in his cell, he advances no arguments and proffers no evidence, admissible or otherwise, in opposition to defendants' motion in this regard.  Amen. Compl. at 20 ¶ 74; see Dkt. No. Dkt. No. 193-2 at 14-15.  Accordingly, it is recommended that plaintiff's First Amendment retaliation claims against C.O. Breyette and C.O. Tucker be dismissed.

### b. Capt. Devlin

As an initial matter, defendants have submitted Capt. Devlin's sworn affidavit in which he acknowledges that he was aware that plaintiff was a member of the Clinton C.F. ILC, but was unaware that plaintiff authored the December 9, 2015 memorandum to Assemblyman O'Donnell or the December 16, 2015 proposed ILC agenda.  See Dkt. No. 178-6 at 2 ¶ 4.  Further, Capt. Devlin denies banging on plaintiff's OMH cell; saying, 'What the [f]uck are you still doing here?" or "You'll see," in response to plaintiff's statement, "Why did I get 90 days, the maximum sentence for my first non-violent Tier III [misbehavior report]?"  Id. at 2 ¶¶ 7-8; Amen. Compl. at 20 ¶ 75.  Thus, defendants have established, through admissible evidence, that, "[a]t the time of the events in question," Dkt. No. 178-6 at 1 ¶ 2, 2 ¶ 4, Capt. Devlin lacked knowledge of plaintiff's

constitutionally protected December 2015 ILC activities, such that he did not make the purported statements in retaliation for plaintiff's protected conduct.  See Henson, 2015 WL 9809874, at *12-13; Van Dunk, 2013 WL 5970172, at *9.  In any event, courts in this circuit have held that more explicit threats than the vague statements alleged here do not rise to the level of adverse action sufficient to support a First Amendment retaliation claim.  See Kemp v. LeClaire, No. 03-CV-844S (WMS), 2007 WL 776416, at *15 (W.D.N.Y. Mar. 12, 2007) (holding that threats from official that the plaintiff's "day [was] coming," that he would "be sent to [his] mother in a black box," and that he would "get [his] ass kicked" were insufficient to establish adverse action to support a First Amendment retaliation claim); Bartley v. Collins, No. 95-CIV-10616 (RJH), 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (holding that verbal threats such as "we going to get you, you better drop the suit" do not rise to level of adverse action).

Further, Capt. Devlin's lack of knowledge of plaintiff's constitutionally protected ILC activities undercuts plaintiff's allegation that Capt. Devlin did not remove the ice pick from the evidence dropbox within 72 hours so that the February 2016 misbehavior report could be "fabricated" in retaliation for plaintiff's constitutionally protected ILC activities.  Amen. Compl. at 23 ¶ 87; See Henson, 2015 WL 9809874, at *12-13Van Dunk, 2013 WL 5970172, at *9.  Indeed, contrary to plaintiff's conclusory allegations, the record is devoid of facts or evidence supporting plaintiff's contention that Capt. Devlin's failure to remove the ice pick from the dropbox within the time period required pursuant to DOCCS Directive 4910A occurred for any reason aside from administrative oversight.  See Amen. Compl. at 23 ¶ 87.  Moreover, as Capt. Devlin explains in his sworn affidavit, the fact that the ice pick was not removed from the evidence dropbox

within 72 hours had no impact on plaintiff's March 2016 disciplinary hearing because "no one accessed the dropbox during th[at] time." Dkt. No. 178-6 at 3 ¶ 10. Thus, the admissible evidence demonstrates that Capt. Devlin's failure to remove the icepick from the evidence drop box within the 72 hour-period contemplated under DOCCS's policy does not constitute adverse action and is not causally related to plaintiff's constitutionally protected activities. In opposition, plaintiff's speculative and conclusory allegations that the photograph of the weapon, along with Capt. Devlin's statements to him on February 29, 2016 "shows the big picture," and raises an inference that Capt. Devlin retaliated against him, Dkt. No. 193-2 at 21, fail to defeat defendants' documentary case. See Flaherty, 713 F.2d at 13; Zembko, 2007 WL 948323, at *4 n.1. Accordingly, it is recommended that plaintiff's First Amendment retaliation claim against Capt. Devlin be dismissed.

### c. Capt. Bishop

Plaintiff's First Amendment retaliation claims against Capt. Bishop relating to the March 2016 disciplinary hearing are conclusory and belied by defendants' admissible evidence. Capt. Bishop's sworn affidavit states that "[n]one of the actions that [he] took with regard to [plaintiff] had anything to do with his participation as a member of the ILC[,]" and "were not motivated by a desire to retaliate against him for his activities on [the ILC], or any other constitutionally protected activity." Dkt. No. 178-4 at 5 ¶ 27. Further, as discussed above, the March 2016 Tier III hearing and resulting sanctions occurred more than two months after plaintiff had engaged authored the December 9, 2015 memorandum to Assemblyman O'Donnell or drafted the proposed December 16,

60

2015 ILC memorandum and, therefore, the timeline does not raise a strong inference of retaliation. See Webster, 694 F. Supp. 2d at 183-84; Pierrot, 2017 WL 4221117, at *8. Further, the record is devoid of statements Capt. Bishop made to plaintiff that could evidence that Capt. Bishop found plaintiff guilty of weapons possession based on a retaliatory animus. See Baskerville, 224 F. Supp. 2d at 732. Moreover, although Capt. Bishop's March 2016 Tier III disciplinary decision was ultimately reversed on plaintiff's administrative appeal because Rodriguez "believed, based upon the location of where the weapon was found, that it was possible that someone else had placed the weapon there, not [plaintiff]," the record is devoid of evidence indicating that Rodriguez reversed that determination because a review of the proceeding evidenced that Capt. Bishop's determination was influenced by or premised on a retaliatory motive. Indeed, the sworn affidavits of C.O. Breyette and C.O. Tucker establish, the icepick was recovered from plaintiff's cell on February 28, 2016, see Dkt. No. 178-5 at 2 ¶ 8; Dkt. No. 178-10 at 2 ¶ 7, and, based on that evidence, Capt. Bishop concluded that plaintiff was guilty of possessing a weapon in violation of DOCCS rule 113. Dkt. No. 178-4 at 5 ¶ 27. Therefore, defendants have established that Capt. Bishop would have found plaintiff guilty of the charges in the February 2016 misbehavior report and imposed the resulting sanctions regardless of any retaliatory motive. See Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18 (citation omitted). Thus, aside from plaintiff's conclusory allegations, nothing before the undersigned suggests that plaintiff's constitutionally protected ILC activities were "a substantial or motivating factor" in any of Capt. Bishop's actions relating to the March 2016 disciplinary hearing and resulting sanctions. Burton, 664 F. Supp. 2d at 367.

Similarly, no inference of retaliation concerning Capt. Bishop may be inferred based on plaintiff's filing of Grievance CL-68902-16.  Plaintiff's grievance challenged the guilty determination from his February 2016 Tier III disciplinary hearing relating to his use of DOCCS letterhead.  See Dkt. No. 25-1 at 4-6.  Plaintiff only mentions Capt. Bishop in this grievance for the proposition the January 2016 misbehavior report was issued in error, as purportedly evidenced by the fact that Capt. Bishop, along with other DOCCS personnel, had "received letters from [plaintiff] on various topics, on [DOCCS] letterhead" prior to plaintiff using that letterhead in his correspondence with Hollmen.  Dkt. No. 25-1 at 5.  Plaintiff does not allege any wrongdoing against Bishop in the grievance, which was lodged against Kowalowski for his alleged involvement with the first misbehavior report "in retaliation for [plaintiff] requesting the name of the ILC Advisor in Albany Central Office while responding to [the] letter from . . . Hollmen."  Id. at 4.  Indeed, the only relief sought through that grievance was reversal and expungement of his February 2016 disciplinary determination.  Id. at 4.  As the IGRC's decision denying the grievance made clear, plaintiff's grievance was not an appropriate "substitute appeal mechanism.  An individual decision or disposition resulting from a disciplinary proceeding is not grievable."  Id. at 7.  Moreover, the record is devoid of facts that would allow the Court to draw the "legitimate inference" that Capt. Bishop retaliated against plaintiff based on his grievance filed against Kowalowski.  Espinal, 558 F.3d at 130; see Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing a retaliation claim against a correction officer where the only alleged basis for retaliation was a complaint written against another officer); see also Burroughs v. Mitchell, 325 F. Supp. 3d 249, 282 (N.D.N.Y. 2018) ("As a general matter, it is difficult to establish one

defendant's retaliation for complaints against another defendant." (internal quotation marks and citation omitted)).  In any event, plaintiff does not allege that Capt. Bishop was aware that he was mentioned in the grievance, or that he took adverse action based on that grievance, but instead, conclusorily alleges that "[j]ust two (2) days" after his grievance was filed by IGP Supervisor Gregory on February 26, 2016, some unidentified individual(s) "planted" the icepick in his cell.  See Amen. Compl. at 20 ¶ 74.  Accordingly, it is recommended that plaintiff's First Amendment retaliation claim against Capt. Bishop relating to the March 2016 disciplinary hearing be dismissed.

### d. Supt. Kirkpatrick, Supt. Uhler, Venettozzi, and Rodriguez

Even affording the Amended Complaint the most liberal construction possible, plaintiff does not allege any specific claims of retaliation against Supt. Kirkpatrick, Supt. Uhler, Venettozzi, and Rodriguez.  See Amen. Compl. at 20-42.  Rather, plaintiff's retaliation claims insofar as asserted against these defendants, are premised exclusively on their purported involvement in the alleged conspiracy against him based on his December 2015 ILC activities.  See id.  Thus, as plaintiff has only conclusorily alleged that Supt. Kirkpatrick, Supt. Uhler, Venettozzi, and Rodriguez retaliated against him, he has failed to meet his "heightened burden" in establishing a First Amendment retaliation claim because has not pleaded his claim against these defendants "with particularity." Green, 2006 WL 846272, at *3 (citing Brown, 41 F. Supp. 2d at); Williams, 111 F. Supp. 2d at 290.  Moreover, as discussed in detail below, plaintiff's Section 1983 conspiracy claims lack merit and are belied by defendants' admissible evidence.  Consequently, it is recommended that plaintiff's First Amendment retaliation claims

63

based on the March 2016 disciplinary hearing against Supt. Kirkpatrick, Supt. Uhler, Venettozzi, and Rodriguez be dismissed.

### 3. Kowalowski

Kowalowski is entitled to summary judgment dismissing plaintiff's First Amendment retaliation claim.  As to plaintiff's contention that Kowalowski retaliated against him through his comment that ILC inmates "all have a target on your back, be careful," Kowalowski has established through his sworn declaration that he made that comment to the entire ILC, as he did with each new ILC class, in order to give them awareness that their status could draw heightened attention from staff and other inmates.  Amen. Compl. at 12 ¶ 44; see Dkt. No. 179-3 at 2 ¶ 7.  Further, to sustain a First Amendment retaliation claim, a plaintiff's constitutionally protected conduct must be a "a substantial or motivating factor in the prison official's decision to take action against him."  Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotations, brackets, and citations omitted).  Here, however, Kowalowski's comment at the November 2015 ILC meeting was, "by definition—unconnected to" plaintiff's constitutionally protected ILC conduct that took place in December 2015—as Kowalowski made the comment before plaintiff had engaged in that conduct.  Richard v. Fischer, 38 F. Supp. 3d 340, 357 (W.D.N.Y. 2014) (internal quotation marks and citation omitted); see Dkt. No. 179-4 at 8-9.  Moreover, plaintiff's allegation that, on January 6, 2016, "Kowalowski violently snatched a piece of paper out of [plaintiff's] hand which listed . . . new proposed TV channels," and stated, "I took it, so what.  You are not as important as you think you are[,]" Amen. Compl. at 15 ¶ 56, fails to establish a claim of

First Amendment retaliation.  Even accepting plaintiff's allegations as true, Kowalowski's actions and comments in this regard amount to, at most, "harassing comments and hostile behavior [that] do not constitute adverse actions sufficient to state a retaliation claim."  Quezada v. Roy, No. 14-CV-4056(CM), 2015 WL 5970355, at *21 (S.D.N.Y. Oct. 13, 2015) (citation and internal quotation marks omitted).  In any event, plaintiff's own documentary evidence belies his assertion.  Specifically, plaintiff submits the January 8, 2016 ILC's letter to Supt. Kirkpatrick, in which the ILC complains that Kowalowski would not show the ILC Clinton C.F.'s contract with Charter Cable, but does not raise any complaints concerning Kowalowski's purported threats and plaintiff does not contend that he ever filed a grievance or made any other complaint about this incident.  See Dkt. No. 25-1 at 143.

Further, Kowalowski denies threatening plaintiff with SHU confinement in retaliation for plaintiff including complaints about assault by staff in his proposed December 2015 ILC agenda.  See Dkt. No. 179-4 at 9.  Plaintiff's claim in this regard fails for several reasons.  First, Kowalowski states, in his sworn affidavit, that he never read the contents of the proposed ILC agenda, and that when he instructed plaintiff not to submit the proposed agenda, he was simply relaying a directive from Supt. Kirkpatrick that the Clinton C.F. administration would no longer accept ILC agendas longer than one page or containing more than four or five individual items.  See Dkt. No. 179-3 at 4 ¶ 21.  He explains that he did not threaten plaintiff with 270 days in SHU, as he believed, at most, plaintiff's submission of a five-page ILC agenda would result in Clinton C.F. cancelling the ILC meeting.  See id. at 5-6 ¶ 27.  Next, plaintiff's own documentary evidence belies his claim.  For instance, in his January 11, 2016 letter to

Assemblyman O'Donnell, plaintiff stated only that Kowalowski objected to the proposed agenda's length and the highlighting of prison administrator's names, and indicated that "the real reason why [Kowalowski] was upset" was because the proposed agenda "talk[ed] about misrepresentation and/or misappropriation of $10,000 in ILC fundraiser money, violating [DOCCS] Directive 2771." Dkt. No. 25-1 at 124. Conspicuously missing from plaintiff's January 11, 2016 letter is any mention that Kowalowski objected to the contents of the proposed agenda, and makes no mention of Kowalowski taking issue with plaintiff's inclusion of complaints against staff or instructing plaintiff to "water down" the agenda. Dkt. No. 179-3 at 4-5 ¶¶ 26-28 (citing Amen. Compl. at 15 ¶ 55); see Dkt. No. 25-1 at 123-26.

Moreover, the evidence in the summary judgment record establishes that Kowalowski did not issue the January 2016 misbehavior report, was not involved with Sgt. King's decision to issue the misbehavior report relating to plaintiff's use of DOCCS letterhead, and did not participate in the February 2016 disciplinary hearing. See Dkt. No. 179-3 at 7 ¶¶ 47-48, 53, 54. Indeed, Kowalowski "did not personally review [plaintiff's] magazine[]" in his capacity as co-chair of the FMRC, and did not approve the FMRC's decision concerning plaintiff's magazine in retaliation for plaintiff's ILC activities, but rather, because the magazine at issue contained prohibited content. Id. at 6 ¶ 39; see id. at ¶¶ 36, 40. Plaintiff's conclusory assertions in opposition are insufficient to defeat Kowalowski's documentary case in support of summary judgment. Flaherty, 713 F.2d at 13; Zembko, 2007 WL 948323, at *4 n.1.

In addition, the undersigned concludes that plaintiff's reliance on inmate Emerenciano's SHU sentence and lawsuit against Kowalowski is unpersuasive. As

Kowalowski avers, see Dkt. No. 196 at 5,6, plaintiff has not proffered any evidence to establish a causal connection between underlying facts of inmate Emercenciano's case and the present action.  Indeed, Kowalowski's sworn declaration establishes that he did not threaten plaintiff with 270 days in SHU, see Dkt. No. 179-4 at 5-6 ¶ 27, and the uncontroverted evidence establishes that plaintiff never received a 270-day SHU sentence.  Although plaintiff has sought to supplement his pleadings in his response in opposition, his speculative and conclusory assertions fail to rebut Kowalowski's admissible evidence.  See Perez v. New York City Dep't of Corr., No. 10-CV-2697 (RRM/RML), 2012 WL 3704744, at *3 (E.D.N.Y. Aug. 27, 2012) (rejecting the plaintiff's reliance on incidents involving other inmates to support a constitutional claim against the New York City Dept. of Corrections, reasoning that the plaintiff had not "allege[d] anything other than his own conclusory statements to suggest that there [wa]s any causal connection between the alleged incidents and the alleged deprivation of [the] plaintiff's constitutional rights." (citation omitted)).  Consequently, it is recommended that plaintiff's First Amendment retaliation claims against Kowalowski be dismissed.

### C. Section 1983 Conspiracy - February 2016 Disciplinary Proceeding

In order to support a claim for conspiracy pursuant to § 1983, there must be "(1) an agreement . . . ; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002); Cusamano v. Sobek, 604 F. Supp. 2d 416, 468 (N.D.N.Y. 2009).  "An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as

individual action is insufficient." <u>McRae v. Fischer</u>, No. 9:17-CV-0146 (BKS/CFH), 2018 WL 3432743, at *6 (N.D.N.Y. June 6, 2018), <u>report and recommendation adopted</u>, No. 9:17-CV-00146 (BKS/CFH), 2018 WL 3432700 (N.D.N.Y. July 16, 2018). Although exact specifics are not required, "the pleadings must present facts tending to show agreement and concerted action." <u>Anilao v. Spota</u>, 774 F. Supp. 2d 457, 512-13 (E.D.N.Y. 2011) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. <u>See</u> <u>Ciambriello</u>, 292 F.3d at 325. Where "there is no underlying constitutional violation, there can be [no] § 1983 cause of action for conspiracy." <u>Bibeau v. Soden</u>, No. 8:08-CV-0671 (LEK/RFT), 2009 WL 701918, at *8 (N.D.N.Y. Mar. 13, 2009); <u>see also</u> <u>Taylor v. New York Dep't of Corr. Servs.</u>, No. 9:10-CV-140 (MAD/RFT), 2012 WL 913678, at *9 (N.D.N.Y. Feb. 23, 2012) ("[T]he failure of a plaintiff to show an underlying constitutional violation on which to base a section 1983 conspiracy claim means the conspiracy claims fails as a matter of law."), <u>report and recommendation adopted sub nom.</u> <u>Taylor v. New York Dep't of Corr.</u>, No. 9:10-CV-140 (MAD/RFT), 2012 WL 913564 (N.D.N.Y. Mar. 16, 2012).

First, as plaintiff has failed to establish a First Amendment retaliation claim against any defendant based on the January 2016 misbehavior report and February 2016 disciplinary hearing, he has "failed to show an underlying constitutional violation on which to base his section 1983 conspiracy claim" and, therefore, his "conspiracy claim fails as a matter of law." <u>Taylor</u>, 2012 WL 913678, at *9; <u>Bibeau</u>, 2009 WL 701918, at *8. Alternatively, even assuming plaintiff could establish a retaliation claim, the Amended Complaint and supporting documentary evidence is bereft of "facts tending to show agreement and concerted action." <u>Anilao</u>, 774 F. Supp. 2d at 512-13.

Indeed, as set forth in detail above, plaintiff's claims in this regard consist exclusively of "bare allegations of a conspiracy," McRae, 2018 WL 3432743, at *6, which he fails to support with any specific facts or evidence demonstrating that defendants engaged in a meeting of the minds, "such as time, place, or manner in which . . . defendants conspired against plaintiff" to violate his rights with respect to the events surrounding the February 2016 disciplinary proceeding.  Avent v. Reardon, No. 1:19-CV-1565 (GTS/CFH), 2020 WL 7705938, at *7 (N.D.N.Y. Dec. 28, 2020).

Capt. Bishop's, Sgt. King's, Lt. Durkin's, Supt. Kirkpatrick's, and Rodriguez's sworn affidavits, and Kowalowski's sworn declaration establish that those defendants did not enter into an agreement to act in concert to retaliate against plaintiff—which no evidence in the summary judgment record controverts.  See Ciambriello, 292 F.3d 307, 324-25.  Plaintiff's allegations that Capt. Bishop directed Sgt. King to issue the January 2016 misbehavior report is belied by defendants' admissible evidence.  In his sworn affidavit, Sgt. King states that

> Capt[.] Bishop did not direct me to write the IMR and I did not use a "false" [misbehavior report] because Capt[.] Bishop told me to.  I authored a truthful [misbehavior report] because I believed (and still believe) that [plaintiff] violated DOCCS policy by attempting to use his status as a law library clerk to use DOCCS letterhead for personal correspondence. . . .  I did not discuss the [January 2016 misbehavior report] with Capt[.] Bishop before I wrote it or thereafter.

Dkt. No. 178-8 at 2 ¶ 6.  Capt. Bishop's sworn affidavit corroborates Sgt. King's sworn affidavit, as Capt. Bishop explains that he "did not direct Sgt. King to write this [misbehavior report]" and he "did not have any personal involvement in the issuance of

69

th[is] misbehavior report or the [February 2016 disciplinary] hearing." Dkt. No. 178-4 at 2 ¶ 9.

Further, plaintiff's contention that Supt. Kirkpatrick conspired with Lt. Durkin to find plaintiff guilty of the charges in the January 2016 misbehavior report fails. Supt. Kirkpatrick's states in his sworn affidavit that his "decision to assign [Lt.] Durkin as the hearing officer on the [January 2016 misbehavior report] was not motivated by a desire to retaliate against [plaintiff] for his participation on the ILC," Dkt. No. 178-13 at 4 ¶ 19, and that his "assign[ment of] Lt.[] Durkin as the hearing officer . . . . was appropriate as [Lt. Durkin] had not taken part in investigating the incidents underlying the [first misbehavior report], and had served as hearing officer on 22 hearings." Id. at 2 ¶ 8. Lt. Durkin states that he never discussed plaintiff's involvement on the ILC with any other defendant in this action, and that he "did not request to be appointed [as] the hearing officer" or "discuss being appointed the hearing officer with any other [d]efendant." Dkt. No. 178-7 at 2 ¶¶ 4, 9.

Moreover, Rodriguez's sworn affidavit establishes that he "did not work at . . . Clinton [C.F.] and was not personally involved with the issuance of either Inmate Misbehavior Report  . . . in this case. Nor was [he] involved with the hearings, other than to review [plaintiff's] appeals from their decisions." Dkt. No. 178-9 at 1-2 ¶ 3. Rodriguez also denies discussing this case with any other defendant aside from Venettozzi, who worked in the same office, and posits that he has "no memory of speaking with . . . Venettozzi about this case during the relevant time period." Id. at 4 ¶ 3. In addition, although Kowalowski states that Capt. Bishop discussed plaintiff's use of letterhead with him during a January 2016 meeting, Kowalowski states that, while he

"subsequently learned that [Sgt.] King wrote a misbehavior report against [plaintiff] relating to the letterhead[,]" he did not encourage Sgt. King or any other DOCCS personnel to write a misbehavior report, did not participate in any way in the February 2016 Tier III disciplinary hearing, id. at ¶ 53, and was not referenced in the January 29, 2016 misbehavior report.  See Dkt. No. 179-4 at 17.

In opposition, to the extent plaintiff attempts to controvert defendants' admissible evidence concerning his conspiracy allegations relating to the February 2016 disciplinary hearing, plaintiff advances only conclusory assertions.  Plaintiff's contention that "[t]he fact that Sgt. King conspired and retaliated against [him] is not defeated because Sgt. King did not know about the Dec. 9th letter or the Dec. 16th Agenda, as his lack of knowledge of this memo and agenda did not prevent him from conspiring and retaliating[,]"  Dkt. No. 193-2 at 12, is wholly conclusory and unsupported by any admissible evidence.  Thus, plaintiff has failed to raise a genuine issue of material fact sufficient to defeat defendants' documentary case.  See Flaherty, 713 F.2d at 13; Zembko, 2007 WL 948323, at *4 n.1.  Accordingly, it is recommended that plaintiff's Section 1983 conspiracy claim against Capt. Bishop, Sgt. King, Lt. Durkin, Supt. Kirkpatrick, and Rodriguez relating to the February 2016 disciplinary hearing be dismissed.

### D. Procedural Due Process Claims Against Capt. Bishop Relating to the March 2016 Disciplinary Hearing

"To state a claim for procedural due process, there must first be a liberty interest which requires protection."  Lewis v. Murphy, No. 9:12-CV-00268 (NAM/CFH), 2014 WL 3729362, at *7 (N.D.N.Y. July 25, 2014) (citing Valmonte v. Bane, 18 F.3d 992, 998 (2d

Cir. 1994)).  To establish a procedural due process claim under § 1983, a plaintiff must show that he (1) possessed a liberty interest, and (2) was deprived of that interest without being afforded sufficient process.  See Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004).  "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  Id. (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)).  As to the first factor, "[t]he prevailing view in this [C]ircuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement."  Liao v. Malik, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases).  As to the second factor, the plaintiff bears the "burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life in order to recover damages" under § 1983. Vasquez v. Coughlin, 2 F. Supp. 2d 255, 260 (N.D.N.Y. 1998).  Although there are no bright-line rules for this inquiry, the Second Circuit has advised district courts that SHU confinements of fewer than 101 days, "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or [the] record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical."  Palmer v. Richards, 364 F.3d 60, 65 (2d Cir. 2004); see Ortiz, 380 F.3d at 654 ("To be sure, with respect to 'normal' SHU confinement, we have held that a 101–day confinement does not meet the *Sandin* standard of atypicality." (quoting Sealey v. Giltner, 197 F.3d 578, 589 (2d Cir. 1999)).

Here, defendants aver—and plaintiff does not dispute—that plaintiff served a total of 92 days in SHU as a result of both the February and March 2016 disciplinary

determinations.  See Dkt. No. 178-2 at 26; Dkt. No. 178-12 at 2 ¶ 12; see id. at 7-8

(exhibit A to Supt. Kirkpatrick's, listing a chronological history of plaintiff's SHU

confinement).  Thus, plaintiff's SHU confinement, alone, is insufficient to establish

atypicality.  See Ortiz, 380 F.3d at 654.  Where, as here, the SHU confinement "was not

long enough to constitute an atypical and significant deprivation by itself," the

undersigned must "look to the conditions of confinement" to determine whether a due

process violation has occurred.  Smith v. Hamilton, 9:15-CV-0496 (BKS/ATB), 2016 WL

3823395, at *3 (N.D.N.Y. July 12, 2016) (quoting Palmer, 364 F.3d at 66).

　　　In opposition to defendants' motion for summary judgment—citing only to his

unverified Amended Complaint—plaintiff contends that his 92-day stint in SHU

constituted "atypical and significant hardship" because, for the first four days, he did not

have his high blood pressure medicine or a change of clothes, and was "denied a time

cut and PIMS level 2."  Dkt. No. 193-2 at 25.  As defendants aver, see Dkt. No. 195 at

14, the portion of the Amended Complaint that plaintiff relies on in support of his

contention that he was deprived his blood pressure medicine and a change of clothes,

demonstrates that these alleged deprivations occurred prior to the February 2016

disciplinary hearing and relate, instead, to plaintiff's placement in a keep-lock cell on

January 29, 2016—not as a result of the February 2016 misbehavior report or March

2016 disciplinary hearing.  See Amen. Compl. at 16, 17 ¶¶ 61, 62.  Therefore, plaintiff

cannot establish a due process claim relating to his January 2016 keeplock confinement

based on Capt. Bishop's guilty determination at the March 2016 disciplinary hearing.

Further, insofar as plaintiff contends that he was denied a PIMS level two classification,

his due process claim fails "[b]ecause the PIMS . . ., like any security classification . . .

does not create a liberty interest protected by due process." <u>Cicio v. Williams</u>, No. 9:11-CV-1196 (TJM), 2013 WL 3101692, at *5 (N.D.N.Y. June 18, 2013).  In any event, plaintiff has offered no evidence in support of these belated and conclusory allegations—made for the first time in opposition to defendants' motion for summary judgment; therefore, plaintiff has failed to establish that he experienced atypical and significant hardship during his 92-day confinement in SHU.  <u>See</u> <u>Palmer</u>, 364 F.3d at 65; <u>see also</u> <u>Kerzer</u>, 156 F.3d at 400 ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact."); <u>Cusamano v. Sobek</u>, 604 F. Supp. 2d 416, 492 (N.D.N.Y. 2009) ("[W]hile special solicitude permits a *pro se* plaintiff to effectively amend the allegations of his complaint while responding to a motion to dismiss for failure to state a claim (which, typically, comes relatively early in an action), it does not permit him to do so while responding to a motion for summary judgment (which, typically, comes relatively late in an action, for example, where, as here, after the defendants have completed discovery based on the allegations contained in the plaintiff's complaint.").

In addition, it is well settled that the loss of packages, commissary, and phone privileges does not establish an atypical or significant hardship.  <u>See</u> <u>Vega v. Artus</u>, 610 F. Supp. 2d 185, 200 (N.D.N.Y. 2009) ("'[T]he loss of phone, package, and commissary privileges does not give rise to a protected liberty interest under New York law.'" (internal quotation marks and citation omitted)); <u>McEachin v. Selsky</u>, No. 9:04-CV-0083 (FJS/RFT), 2010 WL 3259975, at *9 (N.D.N.Y. Mar. 30, 2010) ("It is expected that confinement in SHU will be accompanied by a loss of privileges that prisoners in the general population enjoy and such conditions fall 'within the expected parameters of the

sentence imposed by a court of law.'") (quoting <u>Frazier v. Coughlin</u>, 81 F.3d 313, 317 (2d Cir. 1996)); <u>see</u> <u>also</u> <u>Borcsok v. Early</u>, No. 9:03-CV-395 (GLS/RFT), 2007 WL 2454196, at *9 (N.D.N.Y. 2007) (holding that a 90–day confinement in SHU alone with 90–day loss of packages, commissary and telephone privileges was insufficient to raise a liberty interest where plaintiff made no showing that the conditions of confinement were atypical or constituted a significant hardship).  Consequently, as plaintiff has failed to establish that the conditions of his confinement in SHU constituted an atypical and significant hardship, it is recommended that plaintiff's due process claims be dismissed on that basis alone.

Moreover, defendants are entitled to summary judgement dismissing plaintiff's specific procedural due process claims relating to Capt. Bishop's conduct as the hearing officer at the March 2016.  The Due Process Clause of the Fourteenth Amendment states: "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1.  "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or polices."  <u>Wilkinson v. Austin</u>, 545 U.S. 209, 221 (2005) (internal citations omitted).  "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship."  <u>Sira v. Morton</u>, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

The constitutionally mandated due process requirements for prison disciplinary hearings include (1) written notice of the charges to the inmate; (2) the opportunity to

appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense.  See Wolff v. McDonald, 418 U.S. 539, 564-70 (1974); Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004).

The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to . . . an impartial hearing officer." Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996) (citing Wolff, 418 U.S. at 570-71). "Due process in this context requires only that the hearing officer's decision not be 'arbitrary.'"  Kimbrough v. Fischer, No. 9:13-CV-0100 (FJS/TWD), 2014 WL 12836864, at *4 (N.D.N.Y. Oct. 21, 2014) (quoting Wolff, 418 U.S. at 571), report and recommendation adopted, No. 9:13-CV-100 (FJS/TWD), 2016 WL 660919 (N.D.N.Y. Feb. 18, 2016).  A decision is not "arbitrary" if it is supported by "some evidence." Superintendent v. Hill, 472 U.S. 445, 455 (1985).  "This standard is extremely tolerant and is satisfied 'if there is any evidence in the record that supports' the disciplinary ruling."  Sira, 380 F.3d at 69 (quoting Friedl v. City of New York, 210 F.3d 79, 85 (2d Cir. 2000)).  "[O]nly 'reliable' evidence can constitute 'some evidence.'"  Id. at 76 (quoting Luna, 356 F.3d at 488).  "The subsequent modification of [plaintiff's] determination during the administrative appeals process . . . does not impact the due process analysis," and "[t]he outcome of an administrative appeal or a state court proceeding does not, by itself, resolve the question of whether a constitutional violation occurred." Alexander v. Fischer, No. 9:14-CV-548 (GLS/ATB), 2015 WL 10568892, at *4 (N.D.N.Y.

Dec. 21, 2015) (citing Walker v. Bates, 23 F.3d 652, 657 (2d Cir. 1994) (additional citations omitted), report and recommendation adopted, No. 9:14-CV-548(GLS/ATB), 2016 WL 1261124 (N.D.N.Y. Mar. 30, 2016).

Here, plaintiff does not allege that he did not receive timely written notice of the charges against him; was not offered employee assistance to prepare for his Tier III disciplinary hearing; or that Capt. Bishop did not issue a written decision that included the evidence he relied on and his reasoning for his ultimate disposition. See Amen. Compl. at 22-23. Therefore, plaintiff's claims are limited to whether Capt. Bishop acted impartially; deprived plaintiff of certain evidence he requested at the March 2016 disciplinary hearing; erred in reaching certain conclusions based on the evidence elicited at the hearing. See id. at 22 ¶ 84, 23 ¶ 87.

Plaintiff's Amended Complaint, read liberally, contends that Capt. Bishop was not an impartial hearing officer because he was involved in the underlying incident giving rise to the March 2016 disciplinary hearing he presided over as hearing officer since his name appears on the UIR relating to the discovery of an icepick in plaintiff's cell on February 28, 2016. See Amen. Compl. 22 ¶ 84. Plaintiff also relies on his retaliation claim that Capt. Bishop "conspired with [Supt.] Ulher of [Upstate C.F.], a former [c]aptain of [s]ecurity at [Clinton C.F.] in 2008[,] to be assigned as the hearing officer at [Upstate C.F.] to hold [the] hearing, even though [Upstate C.F.] employs a full-time . . . Hearing Officer . . ." to establish that Capt. Bishop was not a fair and impartial hearing officer. Id. However, defendants proffer Capt. Bishop's sworn affidavit in which he states that [he] did not draft [the] UIR or investigate the claims within it" and that his "name was listed on the UIR as the 'person reporting' because, as a matter of course,

77

the Captain's name was listed on all UIRs." Dkt. No. 178-4 at 3 ¶ 14. Supt.

Kirkpatrick's sworn affidavit further explains that "Bishop did not investigate the incident

giving rise to the March 2016 misbehavior report,]" and that Capt. Bishop's "name is

listed on the UIR simply because the [c]aptain's name is listed on the UIR as a matter of

course." Dkt. No. 178-13 at 3 ¶ 16. Moreover, Supt. Kirkpatrick's sworn affidavit

establishes the paperwork procedure for how UIRs are processed. See id. at ¶ 17. In

particular, Supt. Kirkpatrick's sworn affidavit establishes that a captain reviews the UIR

forms to make sure they are properly completed, but that the captain is not "considered

to have 'investigated' the incident merely by being part of this chain of review." Id.

Moreover, Supt. Kirkpatrick's and Capt. Bishop's sworn affidavits establishes that it was

"common procedure and courtesy" for Capt. Bishop to preside over the March 2016

disciplinary hearing even though the hearing was held at Upstate C.F., because the

incident giving rise to the proceeding—the discovery of the icepick in plaintiff's cell—

occurred at Clinton C.F. Dkt. No. 178-13 at 3 ¶ 13; see Dkt. No. 178-4 at 3 ¶ 16. In

addition, the sworn affidavits of Supt. Kirkpatrick, Capt. Bishop, and Supt. Uhler,

establish that Supt. Kirkpatrick, as part of his duties as superintendent of Clinton C.F.,

independently assigned Capt. Bishop to serve as the hearing officer at the March 2016

disciplinary hearing—without engaging any prior discussions of the assignment with

Capt. Bishop or Supt. Uhler. See id.; see Dkt. No. Dkt. No. 178-11 at 2 ¶ 6; Dkt. No.

178-4 at 13 ¶ 16. Thus, defendants have established through admissible evidence that

Capt. Bishop was not appointed to serve as hearing officer for the purpose of ensuring a

finding of guilt and that he was not involved in the investigation relating to the charges

contained in the February 2016 misbehavior report. Plaintiff's conclusory arguments in

78

opposition, which amount to only reassertions of the claims contained in his unverified Amended Complaint, see Amen. Compl. 22 ¶ 84; Dkt. No. 193-2 at 21, fail to raise a genuine issue of material fact.

Next, plaintiff alleges that Capt. Bishop violated his procedural due process rights by declining to grant him access to "requested . . . E-Block (Unit) log book entries from 9:00 a.m. on February 28, 2016, until 5:00 p.m., on March 1, 2016," and provided him only with log book entries from February 28, 2016.  Amen. Compl. at 23 ¶ 87; see id. at 24 ¶ 89.  Plaintiff notes that the handwritten date contained on the photograph of the icepick recovered from his cell on February 28, 2016, was dated February 29, 2016, and that non-party C.O. Stiles recorded the weapon "as being photographed on February 29[,] 2016."  Id. at 23 ¶ 87.  Plaintiff believes that the logbook entries for the days before and after February 28, 2016, were relevant to his defense at the hearing because "the evidence drop box log book [] [did not] have a date [] when the evidence was entered into the drop box," and he "feel[s] this evidence wasn't logged in on February 28, 2016, and [that[ without seeing the previous . . . and the forward pages, [he was not] able to identify whether or not it was logged in at the time."  Id. at 24 ¶ 90.  Plaintiff relies on the inconsistency between the date of the February 28, 2016 misbehavior report and the date on the photograph of the weapon in support of his contention that, on "February 29[], 2016, []Capt[.] Devlin conspired with Capt. Bishop to fabricate the [February 28, 2016 misbehavior report]."  Id. at 23 ¶ 87.

Capt. Bishop's sworn affidavit establishes that the handwritten date of February 29, 2016, contained under the photograph of the weapon, was due solely to a clerical error and is not relevant to the weapons charge that formed the basis of the February

2016 misbehavior report.  See Dkt. No. 178-2 at 28; Dkt. No. 178-4 at 4 ¶ 22.  As

plaintiff acknowledges, he "questioned" the inconsistency at the hearing by asking Sgt.

Baker, "[d]id you drop the . . . weapon in the box the same date that you . . . wrote the

memo?" to which Sgt. Baker replied, "'It was on the same day.'"  Amen. Compl. at 24-25

¶ 93 (quoting Dkt. No. 25-2 at 51).  As Capt. Bishop explains, on March 29, 2016, the

last day of the March 2016 disciplinary hearing, he questioned Sgt. Baker, who stated

that the correct date on which the weapon was recovered and photographed was

February 28, 2016, and that the handwritten date contained on the photograph was a

"clerical error."  Id. at 5 ¶ 23.   Moreover, Capt. Bishop noted that, between the second

and third days of the March 2016 disciplinary hearing, Sgt. Baker reviewed his

attendance records, which indicated that he was not working on February 29, 2016, but

was working on February 28, 2016, and that he had photographed the weapon;

therefore, Capt. Bishop "concluded that the 28th" was the correct date, "and the hand-

written date was an error."  See id. at ¶ 24.  Thus, as defendants aver, Capt. Bishop did

not deprive plaintiff procedural due process based on his decision not to provide plaintiff

with the additional log book dates because those pages were irrelevant, as it was

established that the date contained on the photograph of the icepick was a mere

scrivener's error that had no impact on the outcome of the hearing.  See Torres v.

Selsky, No. 9:02-CV-0527 (DNH/DEP), 2005 WL 948816, at *7 (N.D.N.Y. Apr. 25, 2005)

("Evidence considered to be irrelevant or unnecessary to the issues truly in contention

may, in a hearing officer's discretion, properly be excluded in such a proceeding."

(citation omitted)).

Similarly, plaintiff's contention that Capt. Bishop violated his due process by preventing plaintiff from asking Sgt. Baker whether he had ever "'secured evidence in the drop box in previous times[,]'" or if he "'kn[e]w what [he was] supposed to do in the evidence drop box sign in sheet when [he] secure[d] evidence'" is meritless.  Amen. Compl. at 26 ¶¶ 99, 100 (quoting Dkt. No. 25-2 73-74).  As the record makes clear, Capt. Bishop asked Sgt. Baker if he had "secure[d]" the weapon "on [February 28,] 2016[,] in the evidence drop box[,]" to which Sgt. Baker replied, "Yes I did."  Id. at ¶ 101 (quoting Dkt. No. 25-2 at 75).  As discussed above, Sgt. Baker's testimony at the hearing established that the wrong date had been recorded on the photograph, but that he entered the weapon into evidence on February 28, 2016, the last day he worked before being off on February 29, 2016.  Dkt. No. 178-4 at 5 ¶¶ 23, 24.  Thus, the exclusion of plaintiff's proposed line of questioning was appropriate, as it was neither relevant nor necessary to plaintiff's defense at the hearing.  See Tafari v. McCarthy, 714 F. Supp. 2d 317, 377 (N.D.N.Y. 2010) ("'A hearing officer does not violate due process by excluding irrelevant or unnecessary testimony.'" (quoting Kalwasinski v. Morse, 201 F.3d 103, 109 (2d Cir. 1999)).

Further, plaintiff cannot establish a procedural due process claim based on Capt. Devlin's violation of DOCCS Directive 4910A by failing to remove the icepick from the evidence drop box within 72 hours.  It is well established that "[v]iolations of state law do not give rise to claims under 42 U.S.C. § 1983 . . .[, and, m]ore specifically, a violation of a DOCCS directive does not state a claim for a constitutional violation under § 1983." Tuitt v. Chase, No. 9:11-CV-0776 (DNH/TWD), 2013 WL 877439, at *10 (N.D.N.Y. Jan. 30, 2013) (internal citation omitted), report and recommendation adopted, No. 9:11-CV-

0776 (DNH/TWD), 2013 WL 877617 (N.D.N.Y. Mar. 8, 2013).  In any event, defendants have established that, although the weapon remained in the evidence dropbox longer than contemplated under DOCCS Directive 4910A, the evidence was not ultimately affected in any way, because "no one accessed the drop box during this time."  Dkt. No. 178-6 at 3 ¶ 10.  Thus, plaintiff's procedural due process claim in this regard fails.  In addition, to the extent that plaintiff argues that the disciplinary hearing was the result of a false misbehavior report, see Amen. Compl. at 24-27, 70, his conclusory assertion does not alter the foregoing analysis.  It is well settled that prison inmates have no constitutionally guaranteed immunity from being falsely or wrongfully accused of conduct for which they are subjected to a deprivation of a protected liberty interest provided that, as plaintiff was here, the prisoner was afforded sufficient procedural due process.  See Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986).  Similarly, to the extent that plaintiff relies on the July 2017 administrative reversal of the March 2016 disciplinary decision to establish that Capt. Bishop violated his procedural due process rights, his claim fails.  See Alexander, 2015 WL 10568892, at *4 (citing Walker, 23 F.3d at 657 (additional citations omitted)).  Based on the foregoing, it is recommended that plaintiff's procedural due process claims against Capt. Bishop be dismissed.

### E. Section 1983 Conspiracy – March 2016 Disciplinary Proceeding

Plaintiff has failed to establish a First Amendment retaliation claim against any defendant based on the February 2016 misbehavior report and March 2016 disciplinary hearing, and failed to establish that Capt. Bishop violated his due process rights at the March 2016 disciplinary hearing; therefore, as plaintiff has "failed to show an underlying

constitutional violation on which to base his section 1983 conspiracy claim," his "conspiracy claim fails as a matter of law." Taylor, 2012 WL 913678, at *9; Bibeau, 2009 WL 701918, at *8. In any event, plaintiff's Section 1983 conspiracy claims relating to the March 2016 disciplinary hearing are wholly conclusory and belied by defendants' admissible evidence. C.O. Breyette's and C.O. Tucker's sworn affidavits both state that they recovered a weapon from plaintiff's cell on February 28, 2016, which provided the basis for C.O. Breyette's misbehavior report. See Dkt. No. 178-5 at 2 ¶¶ 8, 10; Dkt. No. 178-10 at 2 ¶ 7. Both C.O. Breyette and C.O. Tucker state that he did not communicate about the incident with any other defendant in this action concerning the discovery of the weapon, and deny conspiring with anyone against plaintiff. See Dkt. No. 178-5 at 2 ¶ 11; Dkt. No. 178-10 at 2 ¶ 10. Further, Capt. Bishop's, Supt. Kirkpatrick's, and Supt. Uhler's sworn affidavits establish that Supt. Kirkpatrick appointed Capt. Bishop to preside over the March 2016 disciplinary hearing without consulting with Capt. Bishop or Supt. Uhler, and that he appointed Capt. Bishop to preside as the hearing officer even though the hearing took place at Upstate C.F. following plaintiff's transfer pursuant to "common procedure and courtesy" because the underlying incident had occurred at Clinton C.F. Dkt. No. 178-13 at 3 ¶ 13; see Dkt. No. 178-11 at 1, 2 ¶¶ 2, 6; Dkt. No. 178-4 at 3 ¶ 16, 5 ¶ 27. Indeed, in his sworn affidavit, Supt. Kirkpatrick states that he "did not discuss the appointment with [Capt.] Bishop or [Supt.] Uhler." Dkt. No. 178-13 at 2 ¶ 11. Likewise, Capt. Devlin, Venettozzi, and Rodriguez all deny conspiring against plaintiff or discussing the February 2016 incident. See Dkt. No. 178-6 at 3 ¶¶ 12, 16; Dkt. No. 178-9 at 1-2 ¶ 3; Dkt. No. 178-12 at ¶ 4.

Plaintiff's contentions in opposition are devoid of any specific factual allegations, and plaintiff has not proffered any evidence to controvert defendants' sworn statements. See Dkt. No. 193 at 12, 13, 15, 16. Indeed, plaintiff has not advanced any specific facts or evidence demonstrating that defendants engaged in a meeting of the minds, "such as time, place, or manner in which . . . defendants conspired against plaintiff" to violate his rights with respect to the events surrounding the March 2016 disciplinary proceeding. Avent, 2020 WL 7705938, at *7. Consequently, it is recommended that plaintiff's Section 1983 conspiracy claim against C.O. Breyette, C.O. Tucker, Capt. Bishop, Capt. Devlin, Supt. Kirkpatrick, Supt. Uhler, Venettozzi, and Rodriguez based on the March 2016 disciplinary hearing be dismissed.

In light of the foregoing recommendations that defendants are entitled to summary judgment dismissing plaintiff's First Amendment retaliation claims and Section 1983 conspiracy claims on the merits, the undersigned declines to address defendants' arguments regarding personal involvement[9] and qualified immunity.

## IV. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 178) be **GRANTED IN ITS ENTIRETY**, and it is further

**RECOMMENDED**, that Kowalowski's Motion for Summary Judgment (Dkt. No. 179) be **GRANTED IN ITS ENTIRETY**, and it is further

---

[9] The undersigned notes that defendants' arguments regarding personal involvement are based exclusively on their arguments concerning the merits of plaintiff's First Amendment retaliation and Section 1983 conspiracy claims, while conceding Capt. Bishop's personal involvement with the alleged due process violations at the March 2016 Tier III disciplinary hearing. See Dkt. No. 178-2 at 10-16.

**RECOMMENDED**, plaintiff's Amended Complaint (Dkt. No. 25) be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 6(a), 6(e), 72.[10]

Dated: May 19, 2021
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[10] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Id. § 6(a)(1)(C).